# Tennessee Coal, Iron & Railroad Company *v.* Hamilton.

*Action on the Case by Riparian Proprietor for Damages for Polluting Stream of Water.*

1. *Use of stream by riparian owners.*—While an upper riparian owner may use the waters of a stream for mining purposes, and, to a certain extent, impair its purity, he may not so pollute it as to render it un-fit for the domestic use of a lower riparian owner, or so use it as to fill up the channel, and cause the debris to be deposited on the land.

2. *Plea of contributory negligence.*—In an action by a lower riparian owner against an upper riparian owner for the pollution of the water and making deposits in the stream, filling up its channel, causing debris to be deposited on the land. a plea that plaintiff was guilty of negligence contributing to the injury, in that she failed to take due precautions to prevent it, is insufficient.

3. *Evidence by defendant of pollution of stream by another.*—In such action, defendant can show that other persons were making deposits in the stream above plaintiff's property, defendant not being liable for the separate wrong of another.

4. *Burden of proof.*—In such action, the defendant having denied

VOL O.

[Tennessee Coal, Iron & R. R. Co. v. Hamilton.]

all plaintiff's allegations, it was error to charge that the burden of proof was upon defendant, without any precedent inquiry as to whether defendant had polluted the water.

5. *Measure of damages*—The pollution of water having ceased, recovery should be had only for the injury from the pollution while it lasted, and from the deposit till such time as it would be washed away.

6. *Use of natural stream for manufactures, &c.*—The wants of agriculture, manufactures, commerce, invention and of the arts and sciences require that some changes must be tolerated in the flow of natural streams in their adaptation to beneficial uses; reasonable diminution of quantity, temporary detention followed by release in increased volume, as well as some detraction from their natural purity are necessary to be submitted to by the individual for the greater good of the public, but the water must not be diverted from its channel, or so diminished in its volume, or so corrupted and polluted as practically to destroy or greatly impair its value to the lower riparian proprietors.

APPEAL from the Circuit Court of Bibb.

Tried before the Hon. N. D. DENSON.

Action on the case by Alice Hamilton against the Tennessee Coal, Iron & Railroad Company to recover damages suffered by plaintiff, as a riparian proprietor by reason of the pollution of a stream of water, caused by the washing of iron ore therein by defendant.

The complaint contained but one count, in which the plaintiff claimed $1,250 damages, in this: That she was, and had been for many years lawfully possessed of certain lands (describing the same), and that through said lands a certain creek, named "Caffee's Creek," ran, and that "the defendant did, in to-wit, the year 1890, and about the month of April in said year, and against the objection and earnest protest of the plaintiff, construct and put into operation on said creek, an extensive iron ore washer, near the town of Woodstock, in said county and State, and very near to and above the lands of plaintiff, which said iron ore washer the defendant has been constantly running and operating for a long time hitherto, to-wit, since about the month of April, 1880, for the raising and washing of iron ore, using therefor the water of said creek, thereby causing to be discharged into said creek, from its said washer, large quantities of red mud, filth and other debris, in consequence of which the the water flowing in said creek has been constantly so poisoned, corrupted and polluted that it is wholly unfit for use for the watering of cattle or other live stock, or for any other domestic purposes whatever. And plaintiff says that in consequence of said unlawful and wrongful use of said water by the defendant in the raising and washing and cleaning its said iron ore, the water in said creek has been so poison-

ed and corrupted as to kill all the fish in said creek, and to cause the emission from said creek of unwholesome and noxious vapors and odors, such as to render the home of the plaintiff uncomfortable and unhealthy, and to cause her family to be sick. And the plaintiff says that the mud and debris from said ore washer has been so deposited in the bed of said stream, and along the banks thereof, as to cause the said stream to fill up, and overflow her lands, and deposit said mud and other debris thereon, and thereby injure the crops grown on said lands, and diminish the value of her home and farm, and injure and diminish the value of her live stock, of all sorts, by increasing the trouble and cost of keeping and caring for the same. And the plaintiff avers that before the erection and operation of said ore washer by defendant the said stream was a beautiful, clear stream, furnishing excellent, pure water, which was used by the plaintiff for watering her live stock, and for other domestic purposes; that said stream furnishes the only constantly running water on or near the plaintiff's said farm and home, and that said stream is now in consequence of said ore washing as aforesaid, so polluted, fouled and poisoned that no domestic animal of any kind can be induced to drink it. And plaintiff says that the said use of the water of said creek by the defendant, in the wetting of dry sand and dirt, and in the washing of said iron ore, diminishes and reduces the volume of water which would otherwise run in said creek one half, at least. Wherefore, the said plaintiff says that, by the said wrongful and unlawful acts and doings of the defendant. as aforesaid, she has been and is greatly wronged, injured and prejudiced, and has thereby up to this time, sustained great damage."

The defendant demurred to this complaint on the grounds that there is no allegation therein that the defendant was guilty of any negligence in washing its ore, or that it caused any unnecessary amount of pollution to flow through said creek; that it failed to aver any facts which showed that the defendant did not have the right to maintain and operate a washer in the careful manner that caused no unnecessary damage to the plaintiff or any other lower riparian proprietor, and that the facts set out in the complaint do not show that the defendant was making any unreasonable use of the water of the creek; that they failed to show that the defendant could have availed itself of the natural use of its land, for mining the ore on it, without washing its ores on the land, and using the water of the creek therefor. These demurrers to the complaint were overruled, and the defend-

ant then pleaded several pleas. By the first three pleas the defendant pleaded the general issue, and denied the allegations of the complaint. By the fourth plea the defendant set up as a defense that it was engaged in mining iron ore, and converting it into pig iron, on a large scale, and that it was the owner of the lands upon which the washer in question was erected, and that said Caffee's creek ran through the lands so owned by it; that in washing and converting said iron ore into pig iron, there was an absolute necessity to wash the ore in the manner in which the defendant was doing at the time of the alleged contract; that the defendant, in washing said ore, used due care not to injure the land of the plaintiff, or to pollute the water of said creek, and this was absolutely necessary in order to wash said ore; that there was no other water available for washing said ore, except with the water through the creek, and that the ore on the land of the defendant would be useless unless the defendant would be permitted to wash the same in substantially the way in which it was doing it at the time of the alleged agreement; that the defendant could not, with a reasonable expenditure, prevent the deposits from being carried through plaintiff's lands; and that the waters of said creek were not polluted by the washing of said ore to any greater extent than was necessary in order to prepare the ore, in converting it into pig iron. The fifth plea was in the following language: "Defendant, for further answer to the complaint, says that the plaintiff herself was guilty of negligence which proximately contributed to her alleged injury, in this: that she failed to take due precautions to prevent the alleged grievances complained of by her in her complaint." Plaintiff demurred to the fourth plea, setting out various grounds therefor, which demurrers were overruled. To the fifth plea of the defendant, the plaintiff demurred on the following grounds: (1) That the said plea is too indefinite and uncertain in its averments; (2) that it states no facts which constitute contributory negligence on the part of the plaintiff; and (3) that it states a mere legal conclusion, without any facts to support the conclusion. These demurrers were sustained. Issue was joined on the remaining pleas.

It was shown by the evidence that the land of the plaintiff lay adjacent to the creek, and that about 30 or 40 acres were affected by the overflow of the creek in high water, and that the water, after it came out of the washer, was muddy, and was thick with the mud washed from the ore, and was thus rendered unfit for domestic uses, such as washing, cooking, and for watering stock. The sediment which flowed down

the creek with the water from the washer was deposited along the banks of the creek, and filled up the bed of it to about one-half of the creek, and this sediment caused the creek to overflow more than it had previously done. There was also testimony tending to show that there was a deposit of the sediment on the land adjacent to the creek, in some places. The testimony also tended to show that fish had been driven from the creek by reason of its pollution. The creek, at the point where it ran through plaintiff's lands, was from two to three feet deep, and from four to six feet wide. The plaintiff also claimed damages by reason of having been compelled to water her stock during the time the washer was running at another place than in the creek, as was her custom. There was a great deal of testimony introduced on behalf of the plaintiff and the defendant to show how much the plaintiff had been damaged by the pollution of the stream, but, in view of the opinion of the court, it is not necessary to set this testimony out in detail.

Upon the introduction of all the evidence, the court, in its oral charge, instructed the jury, among other things, as follows: "That the burden of proof was on the defendant to show that it made a reasonable use of the water of Caffee's creek during the time it operated its ore washer, and that it exercised due care,—such care as a reasonably prudent man would exercise in and about his own affairs,—and was guilty of no negligence in washing its ore, and that it constructed its washer properly, and used proper precautions to prevent unnecessary injury to plaintiff's land." The defendant excepted to this portion of the oral charge, and also excepted to the following portion of said charge: "The defendant, in order to make out the defense set up by it under its special plea, must show that it made a reasonable use of the water of Caffee's creek, in the washing of its ore, during the time its washer was operated." At the request of the plaintiff the court gave the following written charge to the jury: "The burden of proof is on the defendant to show that the use of the creek was reasonable, and the reasonableness of its use must determine the defendant's rights, which must, in a great degree, depend upon the extent of the detriment of the riparian proprietors below." The defendant duly excepted to the giving of this charge, and also separately excepted to the court's refusal to give each of the written charges requested by it. In these several charges the defendant sought to have the court instruct the jury that the plaintiff could not recover unless the injury complained of was permanent, and also declared that the crite-

rion of damages was the detriment done to the rental or market value of the plaintiff's property, and also asked the court to instruct the jury, in different ways, that the plaintiff could not recover if the defendant had not been careless and negligent in the operation of its washer, and the pollution of the stream had only been such as was necessary in the careful use of the washer. The jury returned a verdict for $475, and judgment was rendered for that amount, whereupon the defendant moved the court to set aside said judgment and grant a new trial, assigning the following grounds therefor: (1) That the verdict was contrary to the law; (2) that the verdict was contrary to the evidence; (3) that the damages assessed were excessive. The court overruled each ground of this motion, and the defendant separately excepted.

HEWITT, WALKER & PORTER, and R. H. PEARSON, for the appellant.

LOGAN, HARGROVE & VANDE GRAAFF, for the appellee.

STONE, C. J.—The contesting parties in this case severally owned tracts of land in Bibb county that were contiguous to each other. A stream of water known as Caffee's creek runs through the two tracts, the Coal, Iron & Railroad Co. being the upper, and Mrs. Hamilton the lower riparian proprietor. The Coal, Iron & Railroad Co. was engaged in mining iron ore from its lands, and had erected and was operating a washer, for washing the ore mined by it. This washer was situated near Caffee's creek, was supplied with water from it; and the water so used, after being somewhat detained for settling purposes, was permitted to flow back into the stream below the washer, but before it reached Mrs. Hamilton's land. Mrs. Hamilton was engaged in agriculture, owned stock, and complains that she had on her lands no water, save Caffee's creek, that was convenient and suitable for watering her stock, without incurring serious additional expense. This action was brought by her, and she avers that by the use of the water in the washer of the Coal, Iron & Railroad Company, it became and was polluted to such extent that stock would not drink it, and further, that it left a deposit in the bed of the stream and on the land that injuriously affected her. Whether the defendant corporation, in the process of washing its ore polluted the stream to such extent as to give to Mrs. Hamilton a right of action, was the main question in this case. There was testi-

mony that by the operation of the washer the water was made so foul that stock would not drink it; that the deposit tended to fill up the bed of the stream and to cause an increase of overflow in freshets, and that it made the bed of the stream miry, so that cattle would not enter the stream. There was conflict of testimony on these questions. On the other hand, there was testimony for the corporation that the ore they were mining was valueless without washing; that this creek was the only available water supply for that purpose, and that there was no outlet for the water after it left the washer, but to let it flow back into the creek. Their testimony tended further to show that they resorted to the customary and best means of purifying the water before permitting it to flow back into the creek.

The old maxim, *aqua currit, et debet currere ut solebat,* is familiar to all. It means, in practical application, that water is the common and equal property of every one through whose domain it flows, and that the right of each to its use and consumption, while passing over his possessions is the same. He must so use it as not to destroy, or unreasonably impair the equal rights of others. *Sic utere tuo ut alienum non laedas,* is the law's mandate in such conditions.—*Stein v. Burden,* 29 Ala. 127.

In these modern times there has been some slight relaxation of the rules regulating the use of water and of water courses. Speaking on this subject, we, in *Ulbricht v. Eufaula Water Co.,* 86 Ala. 587, said: "The general rule is often stated to be, that every riparian proprietor has an equal right to have the stream flow through his lands in its natural state, without material diminution in quantity, or alteration in quality. But this rule is qualified by the limitation, now well recognized, that each of such proprietors is entitled to a reasonable use of the water for domestic, agricultural and manufacturing purposes ; or, to state the rule in the words of Shaw, C. J., in *Cary v. Daniels,* 8 Met. 466, 477; 41 Am. Dec. 532, 'Each proprietor is entitled to such use of the stream, so far as it is reasonable, conformable to the usages and wants of the community, and having regard to the progress and improvement in hydraulic works, and not inconsistent with a like reasonable use by the other proprietors of land on the same stream above and below." In a head note to that case, stating its pith, the true principle was condensed into the following aphorism. "Every riparian proprietor has an equal right to have the stream flow through his lands in its natural state, without material diminution in quantity, or alteration in quality ; but with the limitation,

[Tennessee Coal, Iron & R. R. Co. v. Hamilton.]

now well recognized, that each is entitled to the reasonable use of the water for domestic, agricultural or manufacturing purposes." In *Levis v. Stein*, 16 Ala. 214, it was decided that, "One invested by grant from the government with title to land, through which a water course runs, acquires thereby no greater right to the use .of the water than others, over whose premises the same stream passes, and can not so use it as to corrupt or impair its quality to their prejudice or injury."

In *Merrifield v. Lombard*, 13 Allen, 16 is this language : "Any diversion or obstruction of the water which substantially diminishes the volume of the stream, so that it does not flow *ut currere solebat*, or which defiles and corrupts it to such a degree as essentially to impair its purity and prevent the use of it for any of the reasonable and proper purposes to which running water is usually applied, such as irrigation, the propulsion of machinery, or consumption for domestic use, is an infringement of the right of other owners of land through which a water course runs, and creates a nuisance for which those thereby injured are entitled to a remedy." So in *Printing Co. v. City of Boston*, 122 Mass. 583, it was said, "A riparian owner has no right, in the absence of express grant or prescription, to pollute the waters of a stream and make it unfit for drinking purposes." See also *McGennis v. Adriatic Mills*, 116 Mass. 177.

In *Holsman v. Bolling Springs Bleaching Co.*, 14 N. J. Eq. 335, the principle is thus stated : "Every owner of land through which a stream of water flows is entitled to the use and enjoyment of the water, and to have the same flow in its natural and accustomed course, without obstruction, diversion or corruption. The right extends to the quality as well as to the quantity of the water."

In *Hodgkinson v. Ennor*, 4 Best & Smith, Q. B. 229, one occupying an elevation had erected works for the purpose of extracting lead from the soil. From the operation of these works, polluted water was discharged into certain rents in the rocks of the hills which had an underground passage for water communicating with an outlet, at which the water escaped in an open stream at their foot. From these works polluted water flowed, and reached the lands of plaintiff, whereby the water was fouled. It was held that an action for fouling the stream was maintainable. See also *Lincoln v. Taunton Copper Manfg. Co.*, 9 Allen, 181; *City of Orlando v. Bragg*, 31 Florida Rep. 111.

In Gould on Waters, it is declared that actions may be maintained for the following causes : "The casting upon one's

own land of dirt and foul water, or substances which reach the stream by percolation ; . the letting off of water made noxious by precipitation of minerals ; ·. . . or rendering the water unfit for domestic, culinary or mining purposes; or for cattle to drink of, or fish to live in; or for manufacturing purposes." See also *Clifton Iron Co. v. Dye*, 87 Ala 468; Angell on Water Courses, § 136; Addison on Torts, . § 218; *Carhart v. Auburn Gas Light Co.*, 22 Barb. 297.

It is proper, perhaps, to state a slight modification of the severest interpretation of the language copied above. The same author, in section 220 says: "The natural right of one proprietor to have the stream descend to him in its pure state must yield in a reasonable degree to the equal right of the upper proprietors, whose fertilization, cultivation or occupation of their own lands, and whose use of the stream for mill and manufacturing purposes, for irrigation and domestic purposes, will tend to make the water more or less impure, especially when the population becomes dense. So it is of public importance that the proprietors of useful manufactories should be held responsible only for appreciable injury caused by their works and not for slight inconveniences or occasional annoyances, or even some degree of interference with irrigation or agriculture." We approve the following principle extracted from *Sanderson v. Penn. Coal Co.*, 86 Penn. St. 401. "The exigencies of the great industrial interests must be kept standing in view ; the property of large and useful interests should not be hampered or hindered for frivolous or trifling causes. For slight inconveniences or occasional annoyances they ought not to be held responsible, and in dealing with such complaints, juries should be held with a steady hand."

It is certainly true that owing to the wants, if not the necessities of the present age—of agriculture, of manufactures, of commerce, of invention and of the arts and sciences —some changes must be tolerated in the channels in which water naturally flows, and in its adaptation to beneficial uses. Reasonable diminution of its quantity in gratifying and meeting customary wants, has always been permitted. So, its temporary detention for manufacturing purposes, followed by its release in increased volume, is a necessary consequence of its utilization as a propelling force. Nor must we shut our eyes to the tendency—the inevitable tendency of these and other uses, in which water is an indispensable element, to detract somewhat from its normal purity. These modifications of individual right must be submitted to, in order that the greater good of the public

be conserved and promoted. But there is a limit to this duty to yield, to this claim and right to expect and demand. The water course must not be diverted from its channel, or so diminished in volume, or so corrupted and polluted, as practically to destroy, or greatly impair its value to the lower riparian proprietor. *Sic utere tuo* in such conditions is enjoined by social obligation and by law. It is difficult, if not impossible to declare a rule in language so clear and precise, as that it can be applied with certainty to every case that may arise. See *Miss. Mills Co. v. Smith*, 69 Miss. 289.

A great many questions were reserved during the introduction of the testimony on the trial of this case. So exceptions were reserved to charges given and refused. Very many of these rulings are free from error. We will refer specially to only a few of the exceptions.

There was certainly no error in the rulings on demurrer of which appellant can complain. Under the principles we have declared above the complaint sets forth a good cause of action, and the fifth plea is insufficient in it averments. The Circuit Court did not err in sustaining the demurrer to the fifth plea.

Witness Ray was asked by defendant if there were any other ore washers up there. The obvious meaning and purpose of this inquiry were to prove that some other ore washer on the stream above plaintiff's land had contributed to the pollution of the stream. The court, on plaintiff's motion, refused to let this question be answered, and the defendant excepted. In this the Circuit Court erred. If another, not acting conjointly with defendant in doing the act which produced the alleged adulteration of the water, contributed materially to the result and the injury charged, it is not consistent with law or justice that the defendant should be required to answer in damages for that part of the injury it did not inflict. A different rule would probably prevail if the tort charged was the joint act of two or more; for torts are joint and several, when perpetrated by one act, or with one instrumentality. The question asked indicates that if there was another contributing cause of the alleged pollution of the water, it was independent of, and separate from the ore washer erected and owned by the defendant. It is sufficient for each offender, if acting separately, to be mulcted for its own wrong.

In the general charge and in the written charge given at the request of plaintiff, the court instructed the jury that the burden of proof was on the defendant—The Tennessee

Coal, Iron and Railroad Company—to show that its use of the Creek was reasonable. The defendant, in some of its pleas, had denied all the allegations of the complaint. This cast on plaintiff the burden of proving substantially all the averments of her complaint. If these charges had been preceded by an appropriate inquiry, such as "If the jury found from the evidence that the defendant's washer polluted the water of the stream which flowed on plaintiff's land," or other inquiry of damage which the testimony of plaintiff's witnesses tends to show she suffered, then these charges would be free from error. The charges contain no such expression, but simply assert the naked proposition that the burden of proof was on the defendant.

In certain conceivable conditions these charges would be harmless, but, given as they were, they cannot be vindicated as general propositions of law. In the absence of proof the law imputes blame to no one, but requires of him who makes the charge to establish it by testimony. But we must not be misunderstood. There are categories a person may be placed in, in which the law, or public policy throws the burden of exculpation on the defendant. And sometimes the state of the pleadings has that effect. But this case does not appear to be brought within either of those exceptional rules. The circuit court erred in giving each of these charges.

Most of the charges asked by defendant are incompatible with the principles we have declared as governing this case, and need not be noticed in detail. Not one of them in its entirety is a correct exposition of the law as applicable to the facts of this case. Market value and rental value, whether increased or diminished, are not the sole criteria of damage done to an actual occupant of landed interests. It may not be desirable to sell or let to rent. Profit and comfort of occupation may be taken into the account. The law confers no authority even to enhance the market or rental value of another's freehold, by unauthorized interference with his possession. Whether such unsanctioned interference enhances or diminishes value, are inquiries which may enter into the computation of damages, but they are no test of the right to maintain an action for the tort committed.

Considering the testimony in this case, we think the verdict of the jury was excessive. We cannot perceive that permanent injury to the land has resulted, or will result from what has taken place in running the ore washer. The testimony is that its use has been discontinued, and

that the deposit it had caused is washing out. Unless it should be again put in operation, the probability is almost a certainty that the debris will be entirely removed. This reduces plaintiff's right of recovery substantially to the amount of injury she suffered while the ore washer was being operated. Should it again be put in operation, and should its effect be unauthorized under the principles we have declared, she will be clothed with another right of action for the redress of the wrong. The pollution of the water having ceased by a discontinuance of the use of the washer, it would seem the measure of her recovery should be guaged by the injury she suffered in the actual pollution of the water while it lasted, and in the boggy deposit in the creek, until its injurious effects were, or shall become relieved by the washing of the creek.

Reversed and remanded.