Bissell, J.,
delivered the opinion of the court.
This case presents an entirely new phase of what is well, though somewhat inaccurately, termed the “rights of riparian proprietors along the streams in this state.” Both bench and bar are so hedged in and incased by precedents, and so accustomed to travel by paths so long established as to be rights of way by prescription, that any court might well hesitate *408 when the necessities of a litigation compel them to lay out a road through an 'unknown country. Two corporations attempted to acquire rights to water flowing in Howard’s Fork of the San Miguel river, in San Miguel county. The Suffolk Gold Mining & Milling Company built a stamp mill on the creek, and diverted the water flowing in the creek, and applied it as power to run the stamps, jigs, and concentrators used in connection with their reduction works, as well as to furnish water under the stamps to flow the crushed metal over the amalgamating plates, the tables of the jigs, and through the concentrators; discharging the water, after its use, into a ditch, through which it ultimately returned into the creek. The evidence tended to show that this company had been using the mill for some years, though in their earlier operations it was veiy much smaller, and was not increased to its present size until about the years 1892 and 1893. There was some controversy respecting its present capacity, which was claimed variously to be from 25 to 60 tons. This is immaterial to the determination of the particular proposition involved.
The rights of The San Miguel Consolidated Mining & Milling Company, so far as respects the water flowing in Howard’s Fork, were initiated about the year 1890. This company was a corporation organized for the purpose of furnishing power and light to various mines in its neighborhood, and also to furnish light for the town of Telluride, near which the works of the company were situated. When this company first started its operations, it took its power and water from Lake Fork of the San Miguel river. In 1890, to extend and complete their plant, and for the purpose of enlarging its power and increasing its capacity, they built a dam at the headgate, and ran a pipe line to their plant, and took water from Howard’s Fork. The plant was a very extensive one, and its construction involved the outlay of a very large amount of money. The pipe line ran several miles, and discharged the water onto a Pelton wheel, and thus furnished ample power to run the plant, and supply electric power and *409 light to their customers and to the city. After this line had been running for some time, the San Miguel Company discovered that the nozzle at the end of the pipe line, through which the water was discharged onto the wheel, was being rapidly worn awajq and that the buckets were being worn and destroyed, and that leakages were occurring at various points along the pipe line, which, being investigated, turned out to come from the wearing away and destruction of the connections in the pipe. Further investigations led the San Miguel Company to believe that all this danger and difficult3r proceeded from the condition of the water as it was taken in at the headgate, and that the stamp mill which was located above them was causing all the damage. This whole subject was investigated during the progress of the trial, and the testimony tended to show that the Suffolk Company crushed the ore under its stamps, carried it over their plates and jigging tables, and into their concentrating mills, and that the tailings which resulted flowed off with the water, and down into Howard’s creek and mingled with the general waters of the stream. The ore was crushed sufficiently flue to pass through screens of 45 or 55 mesh, and practically all the material crushed was ultimately discharged into the water of Howard’s Fork, only an infinitesimal amount of the metal value of the ore being retained in the process.
The evidence disclosed that Howard’s Fork was a very considerable stream; its volume at the point where the tailings were discharged into the stream amounting to 250 or 300 cubic feet per minute, while the amount used by the stamp mill to carry off the tailings rarely, if ever, exceeded 8 cubic feet per minute. When the cause of the damage was ascertained, the Milling Company were requested to remedy the difficulty and remove the cause. This they declined to do. It was insisted by them that thej- were the first comers on Howard’s Fork, were appropriators, under the statute, of the waters in the stream, to the extent of their user, and they had a right to use the stream as they chose, and that the subsequent comer must take the water flowing *410 down the fork as he found it when he came, and that he was without right to complain because of the pollution of the waters, or the method of user. Thereupon this action was begun by the San Miguel Company to restrain the Suffolk Company from polluting the water. The case came on for 1)earing, was tried by the court, and a vast amount of testimony taken relative to the cause of the injury, the rights of the respective parties as prior and subsequent appropriaters, and likewise on the proposition whether the Suffolk Company could impound the water as it was discharged from the mill, and thereby avoid the injury of which the plaintiff complained.
In stating these matters of fact, we follow the findings of the trial court. There is evidence in the record to sustain them, and we therefore treat them as conclusive. There was a great deal of evidence offered respecting the difficulty and expense of impounding the water, whereby the damage would be entirely, or at least substantially, avoided. The court found that this might easily and readily be done, and that, if the Suffolk Company should impound its water as it was discharged from the mill, it would very shortly settle, and all the grit, quartz, and fine sand, which had theretofore been discharged into Howard’s Fork, would be retained, and the water used in the mill, subject to a very slight loss in quantity, would be returned in its original state of purity to the fork, along which it had been accustomed to run. No other matters of fact need be stated to render the decision plain, and the principles which we believe should be applied in the settlement of the rights of the parties applicable.
It thus becomes apparent that the pleadings and the proof present the very sharply-defined issue respecting the title which an appropriator of the waters of this state acquires by acts duly performed under the constitution and statutes regulating its acquisition, and the rights which he does or may acquire with reference to other appropriately along the line of the stream, though subsequent in time. This is the sole question argued in the briefs, and therefore the only one we *411 need consider. Evidently there must be a very wide difference between the title and rights which the appropriator acquires as an original or as a subsequent locator and appropriator, and also between those which he may acquire as a first comer, when his appropriation extends to a part only of the waters of a stream, and may also be varied by the character of the application which he makes of the water, as affected by the provisions which give a preferential right to particular classes of appropriators. With these distinctions and differences we are not concerned, for they are not presented by the case, nor raised by the facts which the record discloses. The possible exceptions are suggested, that the opinion may not be regarded as extending to or including any discussion of what the rights of parties would be under different circumstances.
The question under consideration has not been made the subject of any judicial determination in this or any other state, and we are necessarily compelled to resort to those of a kindred and analogous character in order to determine whether therefrom we can derive the true principle by which the rights of these parties must be settled.
An “appropriator” (using this term in its full and absolute sense, and to include both a diversion and an application, both of which are essential to the completion of a title to water) acquires a right of property in that which he has appropriated. It is a right in one sense absolute, and in another qualified; at least, qualified as to its rights with respect to third persons. The supreme court decided in the Strickler Case, 16 Colo. 61, that what the appropriator acquires is “ property,” in the general signification of the term, and that the appropriator acquires a title and right which is in no sense appurtenant to the land to which the water has been applied, and probably not appurtenant to any use which he may make of it. It is capable of severance and transfer, may be applied by the appropriator to other lands and to other uses, and the purchaser may apply or use it on other lands and for other purposes than those to which it was *412 originally put, and retain title, dating it as from the time of the original diversion and application. The court did not go so far as to hold that it was an absolute title and a complete right, subject to no limitations and conditions; nor did the court attempt to hold that this water right might be sold by the original appropriator, and diverted entirely from the stream, or its purity be destroyed. No such question was before the court, nor did it attempt to declare what the law would be under such circumstances. The opinion is equally silent as to the relative rights of the prior and subsequent locators on the stream. As we take it, the title to the waters of the state always remains, in a measurable sense, in the people, and any citizen has a right to use the waters flowing along the streams within our boundaries for any of the uses which the constitution recognizes. The appropriator may acquire title, but that title is necessarily subject to many conditions. This consideration shows it not to he the absolute title which one acquires to personal property either by original discovery or by purchase. For instance, it is subject to loss-by abandonment. A party who locates on a stream, and diverts and applies the water, has a title, so long as he continues to use it, either for the purposes for'which it was originally diverted, or for any legitimate purpose. Yet no one would dispute the proposition that if the appropriator abandons the use, whether it be the original or any subsequent one, lie would thereby lose all title, and the right to the water would revert to the people, and would belong to whomsoever might thereafter appropriate it, and would likewise inure to the benefit of any subsequent locator on the stream who by reason of the abandonment might become both prior in time and prior in right. This demonstrates very conclusively that the title is not absolute, and that the appropriator’s rights are relative. It must be conceded that the title is so far absolute that if the first appropriator runs the water onto his land, and devotes it to the purposes of husbandry, any diminution of the volume or amount of water would be an inconvenience to which subsequent locators must undoubt *413 edly be subject. If some of it was devoted to manufacturing purposes, and in any wise the volume of water was diminished, and probably if its character was unavoidably affected by the nature of the use to which it had been put by the prior appropriator, when no question of preferential, constitutional or statutory rights arose between the parties, the subsequent locator further down the stream, or further up, must of necessity acquire his right subject to these modifications and conditions. In this sense, the appropriator’s title may be regarded as a quasi absolute one, and his rights as superior to those of the late comer. For these reasons it is manifestly impossible to apply the law of riparian proprietors to the settlement of the legal status of two appropriators on the same stream. Riparian rights flow from, and are incident to, the ovvnership of the land through which the stream runs. The riparian proprietor is without title to the water. There was no known way at the common law whereby he could acquire title, unless it was by an actual grant, or by a prescription from which a grant would be presumed, whereby he would be entitled, perhaps, to a user freed from obligations with reference either to the property up or down the stream, as might happen to be the case. While this is true, and the title which the appropriator acquires comes from an observance of the constitutional and statutory requirements, and is not at all dependent on the ownership of riparian lands, yet since his title is a modified one, and his rights are, under some circumstances, subject to limitations and conditions with respect to prior and subsequent appropriators, we see no reason why some of the principles which have been thoroughly settled in many jurisdictions respecting riparian rights may not be applied to the determination of the relative rights of the appropriators along the line of the streams in Colorado. Take the present case, as a very apt illustration of a condition in which the rights of the appropriators should be deemed relative, and not absolute, even with reference to a subsequent locator further down the stream. In the present case the first appropriator neither undertook to appro *414 pílate, nor did he acquire by his acts an absolute title to, the entire stream. According to the findings of the court, the Suffolk Milling Company only .utilized, in disposing of their tailings, about 8 cubic feet per minute. The total volume of the stream was from 250 to 300 cubic feet per minute at any stage of water which experience had found to ran in Howard’s Fork. Whatever title and whatever right the prior appropriator acquired which is here involved or under consideration related and extended only to the 8 cubic feet, and in no manner affected the balance of the water running in the stream. In other words, his title and his right covered only his necessary application for these purposes, and could neither be taken to control, limit, vary, or modify the rights of the subsequent locator as to the balance of the water in the stream. The unappropriated volume of water flowing down Howard’s Fork was undoubtedly subject to subsequent appropriation, and after comers might, equally with the first, acquire a title to the waters thus unappropriated and left flowing in the stream. The subsequent appropriators must have some rights, and the prior appropriators must be subject to the rights which the after locator may acquire; and in this sense, if in no other, the right and title of the first comer must be taken as subject to conditions and limitations. In this case we are to determine simply to what conditions and what limitations the prior appropriators’ title was necessarily subject, under the evidence disclosed by the record. It plainly appears by the proof, and the court found, that the first appropriation was for the purpose of a stamp mill. The uses of such a mill, and its purposes, are well understood in this state. It is a mill erected for the reduction of ore. The quartz is put under the stamps, crushed to a fineness requisite to the general plan of reduction, and the whole mass and bulk is put into such a condition as by amalgamating plates, jigging tables, or concentrators, the valuable product may be extracted, and the refuse must necessarily flow from this reducing machinery, and pass off in the water, whether used as power to run the stamps, or as power to carry off the *415 tailings. This was the user, this the purpose, and, as between these two litigants, there is no question of preferential rights. The Suffolk Company undoubtedly acquired a title, and likewise became possessed of the right to use what water they acquired by their diversion and appropriation, both for the purpose of furnishing power to run the machinery and power to dispose of the tailings.
The troublesome question still remains, whether this right was an absolute one, and whether the application of the water for the removal of the tailings extended so far as to permit them, at their will and pleasure, to discharge those tailings into the stream, whatever might be the effect on subsequent locators. "We think the evidence destroyed this conclusion, for the court found that these tailings were composed of fine, quartz-like, gritty, cutting material, which, flowing into the main body of the stream through the ditch of the Milling Company, mixed with the general volume of the water which was not so used, flowed down the stream into the pipe line of the San Miguel Company, cut out the joints of the pipe, wore out the nozzles and the buckets of the wheel, and produced a constant and daily damage to the lower locators and subsequent appropriators. The question thus recurs, was this a damage for which there is a remedy, and are the rights of the prior appropriator subject to any limitation with respect thereto. It was the law with respect to riparian owners that their use was subject to certain limitations, among which was the preservation of the general volume of the stream for the lower riparian owners, who had the right to receive that volume of water unpolluted, and in its natural condition of purity. It must remain fit for the use of the lower riparian owner. The subject has been discussed in many cases, and in all English-speaking countries the lights of the parties may be deemed to have been settled by a long series of adjudications. The question has arisen in numberless controversies where the questions were of a varying and diverse character. The lower owners were entitled to have the waters preserved in their purity, that fish might swim, that *416 their stock might drink, and that the water might be applied to domestic uses. Parties have been restrained from carrying on a business on the banks of a stream whereby polluting matter would by natural seepage, from rains or from any extraneous cause, be carried into the general volume of the water, and diminish its purity and its usefulness. This has been extended so far as to prevent the owners of lands higher up the stream from using their land at their own pleasure, although they had an absolute fee title thereto, in such way as to injure the lower owners, unless such injury proceeded from natural causes over which the parties had no control. Parties have been permitted to mine their own lands, but even thereon and therein they have been restrained from erecting pumping plants, hoisting water to the surface, discharging it into a stream, and letting it flow to their neighbors in such way as to injure the use and destroy the right which the lower owner had theretofore enjoyed. 1 Wood Nuis., chap. 9; Black, Pom. Water Rights, sec. 76, et seq.; Attorney General v. Council of Birmingham, 4 Kay & J. 538; Attorney General v. Colney Hatch Lunatic Asylum, 4 Ch. App. 146; Young v. Distillery Co., (1893) App. Cas. 691; Beach v. Zinc Co., (N. J. Ch.) 33 Atl. 286; Appeal of Pennsylvania Lead Co., 96 Pa. St. 116; Evans v. Fertilizing Co., 160 Pa. St. 209; People v. Elk River Mill Lumber Co., 107 Cal. 214; McGenness v. Adriatic Mills, 116 Mass. 177; Water Co. v. Watson, 29 N. J. Eq. 366. These cases might be multiplied indefinitely, but the only advantage to be derived from any additional citation of authority would be simply to furnish other illustrations of the application of the same doctrine under different conditions.
If this be the law with reference to riparian proprietors, the only remaining question is whether, in a case like the present one, prior appropriators of the waters of a stream in Colorado acquire a title subject to similar conditions with ref-_ erence to subsequent locators. Under the rule which courts universally recognize, the decision should be limited to a consideration and settlement of the precise case under con *417 sideration. A discussion of a proposition in all of its phases might sometimes be useful to the profession as a precedent, but wherever there is a departure the decision lacks the binding force and value which attaches to an exact precedent. We therefore expressly limit it to a case where the prior use complained of was of only a part of the water of a stream, and the balance of it remained open to appropriation and the acquisition of title by after comers. That is this case. The Suffolk Company acquired title so far as regards a detrimental user to less than one thirtieth of the water of the stream. The balance of it was open to subsequent locators, who were, equally with the first comer, entitled to divert and apply it. Under these circumstances, we are quite of the opinion that .the title and rights of the prior appropriating company were not absolute, but conditional, and they were obligated to so use the water that subsequent locators might, like lower riparian owners, receive the balance of the steam unpolluted, and - fit for the uses to which they might desire to put it. This, of course, is subject to the condition that the circumstances and situation of the use and the application were such as to permit the preservation of the remaining, volume of the stream in its original condition. We do not undertake to decide that, if the prior appropriator had put the property to a use under circumstances which rendered it impossible for him to enjoy it without some detriment to the unappropriated water, he might not have the right to thus use it. Such is not this case. The court found, as a matter of fact, that it was possible for the Suffolk Company to impound their water in settling basins, which the configuration of the country permitted, and thereafter discharge it, freed from its impurity, into the general body of the stream. The obligation and duty of the riparian proprietor in cases of this description has been recognized in many adjudications. As the books put it, it is a question of reasonable use, and the possibility of a fair and legitimate enjoyment of riparian rights, coupled with the preservation of the rights and title of the lower riparian owner. Hayes v. Waldron, 44 N. H. 580; *418 Timm v. Bear, 29 Wis. 254; Prentice v. Geiger, 74 N. Y. 341; Railroad Co. v. Hamilton, 100 Ala. 252; Roller Mills v. Wright, 30 Minn. 249.
We see no reason why this same principle should not be applied in the settlement of the rights of appropriately of the public waters of this state. It undoubtedly carries out the intention and the purpose of our constitutional provision which in general terms reserves to the people of the state the right to all the waters of its streams for the purposes to which the citizens may apply them. We live in a region not blessed with rains, and where all our industries, whether agricultural, manufacturing, or mining, are dependent absolutely on the waters of our streams, as to those purposes for which water is a necessity. It is therefore quite consonant with the apparent purpose and declared will of the people to subject the rights of the appropriately of the public waters of the state to such limitations as shall tend not only to conserve the property interests which the appropriately may acquire, but to preserve the remaining unappropriated waters in their original condition for the use and benefit of late comers, who by their labors and industry may further develop our interests and resources. We believe the principle just, and we believe it applicable. All property rights are subject to the very equitable principle, “Bic utere tuo ut alienum non Icedas This is a principle both of morals and of law, and there is no principle of absolute right to property which is not measurably subject to this condition. Its application in the present case works equity, preserves the rights of both parties, and does no injury. The court has found it practical for the Suffolk Company to have the full beneficial use of its title, and at the same time preserve the waters unpolluted so that they may be fully enjoyed by one who subsequently takes the water from the stream, and is, as we think, entitled to it freed from any pollutions which can be prevented by reasonable means. We are quite unable to concede the force which counsel for the appellant seek to give to the custom which they attempted to prove concerning the use of stamp mills, *419 and the discharge of tailings in the stream. We are cited to one case in Vermont which seems to hold that doctrine. It does not accord with our notions of-the law, and certainly is opposed to well-considered cases which lay down a rule more consonant with our convictions of what the law ought' to be, and of the evidence which should determine the rights of the parties. Iron Co. v. Tucker, 48 Ohio St. 41; 29 Wis. 254.
We do not regard the evidence which was offered to this point as at all pertinent to the controversy, or as evidence which ought to have been weighed and considered by the court in determining the rights of the parties. There has been some argument made respecting the question of balance of injury, and whether it would not be- more expensive to the Suffolk Company to impound their waters, and prevent the pollution of the stream, than for the San Miguel Company to proceed by divers ways and means to protect themselves from this pollution. We do not regard the principle as one properly applicable to a final determination, or a matter which ought to be considered by the court in rendering its final decree. The question of balance of injury may possibly be right, and the court may have a right to consider it on an interlocutory application; but we know of no principle by which equity, otherwise having cognizance of the case, should measure the rights of one party by the cost to the other, committing the injury, to prevent either its -commission or its continuance. As it was put in the English cases, it would be a sorry condition of the law if the courts were compelled to. hold that the property of another might be taken because it would be either inconvenient or expensive to the one committing the nuisance to restrain or prevent its continuance. Higgins v. Water Co., 36 N. J. Eq. 538; Evans v. Fertilizing Co., 160 Pa. St. 209.
We are driven to no such result in the present case. The court found that at a very slight expense, and at a very slight inconvenience, the Suffolk Company could prevent the injury. The court so decreed it, and we are not advised by the record *420 of any subsequent application for its modification. We assume it has been done, and we do not believe that the court erred in compelling it. The judgment of the court below was right, on these principles, and it will accordingly be affirmed.

Affirmed.

Wilson, J., not sitting.