17 So.2d 674

**ELMORE v. INGALLS.**

6 Div. 159.

Supreme Court of Alabama.

April 20, 1944.

Harsh & Hare, of Birmingham, for appellant.

482

Lange, Simpson, Brantley & Robinson and Jas. C. Manning, all of Birmingham, for appellee.

**LIVINGSTON, Justice.**

The appeal is from a decree overruling demurrers to an original bill of complaint seeking to restrain and enjoin the pollution of a stream known as Little Cahaba River, and damages for injuries done to complainant's property who is a lower riparian owner.

The respective rights of riparian owners of land as to the natural flow of water and use thereof, the rights of owners of upper and lower estates with respect to water courses have often been declared by this Court. McCary v. McLendon et al., 195 Ala. 497, 70 So. 715; Smith et al. v. McElderry, 220 Ala. 342, 124 So. 896; Gulf States Steel Co. v. Law et al., 224 Ala. 667, 141 So. 641; Jones et al. v. Tennessee Coal, Iron & R. Co., 202 Ala. 381, 80 So. 463; Tennessee Coal, Iron & R. Co. v. Hamilton, 100 Ala. 252, 14 So. 167, 46 Am.

St.Rep. 46; Sloss-S. S. & I. Co. v. Morgan, 181 Ala. 587, 61 So. 283.

■ In Tennessee Coal, Iron & R. Co. v. Hamilton, supra, this Court, speaking through Chief Justice Stone, said:

"The old maxim, 'Aqua currit, et debet currere ut solebat,' is familiar to all. It means, in practical application, that water is the common and equal property of every one through whose domain it flows, and that the right of each to its use and consumption, while passing over his possessions is the same. He must so use it as not to destroy or unreasonably impair the equal rights of others. 'Sic utere tuo ut alienum non laedas,' is the law's mandate, in such conditions. Stein v. Burden, 29 Ala. 127 [65 Am.Dec. 394].

"In these modern times there has been some slight relaxation of the rules regulating the use of water and of water courses. Speaking on this subject, we, in Ulbricht v. [Eufaula] Water Co., 86 Ala. 587, 6 So. 78 [4 L.R.A. 572, 11 Am.St.Rep. 72], said: 'The general rule is often stated to be that every riparian proprietor has an equal right to have the stream flow through his lands in its natural state, without material diminution in quantity or alteration in quality. But this rule is qualified by the limitation, now well recognized, that each of such proprietors is entitled to a reasonable use of the water for domestic, agricultural, and manufacturing purposes, or, to state the rule in the words of Shaw, C. J. in Cary v. Daniels, 8 Metc. [Mass.] [466], 477, [41 Am.Dec. 532], "Each proprietor is entitled to such use of the stream, so far as it is reasonable, conformable to the usages and wants of the community, and having regard to the progress and improvement in hydraulic works, and not inconsistent with a like reasonable use by the other proprietors of land on the same stream above and below."' In a headnote to that case, stating its pith, the true principle was condensed into the following aphorism: 'Every riparian proprietor has an equal right to have the stream flow through his lands in its natural state, without material diminution in quantity or alteration in quality, but with the limitation, now well recognized, that each is entitled to the reasonable use of the water for domestic, agricultural, or manufacturing purposes.' In Lewis v. Stein, 16 Ala. 214 [50 Am.Dec. 177], it was decided that 'one invested by grant from the government with title to

land, through which a water course runs, acquires thereby no greater right to the use of the water than others, over whose premises the same stream passes, and cannot so use it as to corrupt or impair its quality to their prejudice or injury.'

"In Merrifield v. Lombard, 13 Allen [Mass.], 16 [90 Am.Dec. 72], is this language: 'Any diversion or obstruction of the water which substantially diminishes the volume of the stream, so that it does not flow ut currere solebat, or which defiles and corrupts it to such a degree as essentially to impair its purity, and prevent the use of it for any of the reasonable and proper purposes to which running water is usually applied, such as irrigation, the propulsion of machinery, or consumption for domestic use, is an infringement of the right of other owners of land through which a water course runs, and creates a nuisance, for which those thereby injured are entitled to a remedy.' So, in [Dwight] Printing Co. v. City of Boston, 122 Mass. 583, it was said: 'A riparian owner has no right, in the absence of express grant or prescription, to pollute the waters of a stream and make it unfit for drinking purposes.' See also McGennis v. Adriatic Mills, 116 Mass. 177.

"In Holsman v. [Boiling Springs] Bleaching Co., 14 N.J.Eq. 335, the principle is thus stated: 'Every owner of land through which a stream of water flows is entitled to the use and enjoyment of the water, and to have the same flow in its natural and accustomed course, without obstruction, diversion, or corruption. The right extends to the quality as well as to the quantity of the water.'

"In Hodgkinson v. Ennor, 4 Best & S. [Q.B.] 229, one occupying an elevation had erected works for the purpose of extracting lead from the soil. From the operation of these works, polluted water was discharged into certain rents in the rocks of the hills, which had an underground passage for water, communicating with an outlet at which the water escaped in an open stream at their foot. From these works polluted water flowed, and reached the lands of plaintiff, whereby the water was fouled. It was held that an action for fouling the stream was maintainable. See also Lincoln v. [Taunton Copper] Mfg. Co., 9 Allen [Mass.], 181; City of Orlando v. Pragg, 31 Fla. 111, 12 So. 368 [19 L.R.A. 196, 34 Am.St.Rep. 17].

"In Gould on Waters, it is declared that actions may be maintained for the following causes: 'The casting upon one's own land of dirt and foul water, or substances which reach the stream by percolation; * * * the letting off of water made noxious by precipitation of minerals, * * * or rendering the water unfit for domestic, culinary, or mining purposes, or for cattle to drink of, or fish to live in, or for manufacturing purposes.' See also [Clifton] Iron Co. v. Dye, 87 Ala. 468, 6 So. 192; Angell on Water Courses, § 136; Add. Torts, § 218; Carhart v. [Auburn Gas] Light Co., 22 Barb. [N.Y.], 297.

"It is proper, perhaps, to state a slight modification of the severest interpretation of the language copied above. The same author, in section 220 says: 'The natural right of one proprietor to have the stream descend to him in its pure state must yield, in a reasonable degree, to the equal right of the upper proprietors, whose fertilization, cultivation, or occupation of their own lands, and whose use of the stream for mill and manufacturing purposes, for irrigation and domestic purposes, will tend to make the water more or less impure, especially when the population becomes dense. So it is of public importance that the proprietors of useful manufactories should be held responsible only for appreciable injury caused by their works, and not for slight inconveniences or occasional annoyances, or even some degree of interference with irrigation or agriculture.' We approve the following principle extracted from Sanderson v. [Pennsylvania] Coal Co., 86 Pa. 401, [27 Am.St.Rep. 711]: 'The exigencies of the great industrial interests must be kept standing in view; the property of large and useful interests should not be hampered or hindered for frivolous or trifling causes. For slight inconveniences or occasional annoyances, they ought not to be held responsible, and, in dealing with such complaints, juries should be held with a steady hand.'

"It is certainly true that owing to the wants, if not the necessities, of the present age,—of agriculture, of manufactures, of commerce, of invention and 'of the arts and sciences,—some changes must be tolerated in the channels in which water naturally flows, and in its adaptation to beneficial uses. Reasonable diminution of its quantity, in gratifying and meeting customary wants, has always been permitted. So, its temporary detention for manufac-

turing purposes, followed by its release in increased volume, is a necessary consequence of its utilization as a propelling force. Nor must we shut our eyes to the tendency—the inevitable tendency—of these and other uses, in which water is an indispensable element, to detract somewhat from its normal purity. These modifications of individual right must be submitted to, in order that the greater good of the public be conserved and promoted. But there is a limit to this duty to yield, to this claim and right to expect and demand. The water course must not be diverted from its channel, or so diminished in volume, or so corrupted and polluted, as practically to destroy or greatly impair its value to the lower riparian proprietor. 'Sic utere tuo' in such conditions is enjoined by social obligation and by law. It is difficult if not impossible, to declare a rule in language so clear and precise, as that it can be applied with certainty to every case that may arise. See [Mississippi] Mills Co. v. Smith, 69 Miss. 299, 11 So. 26, [30 Am.St.Rep. 546]." 100 Ala. at pages 258–261, 14 So. at page 169, 46 Am.St.Rep. 46.

■ The bill of complaint in the instant case, after describing complainant's lands, alleges:

"That said lands are contiguous to and abut on the Little Cahaba River, a natural stream of water flowing through said lands and which, prior to the time of the acts and omissions herein complained of, was a clear, fresh mountain stream, unpolluted and uncontaminated, and suitable for drinking by cattle, was a place for fish to live, and for agricultural and recreational uses and purposes. That complainant is a riparian owner on said stream.

"4. That said lands were acquired by complainant in the year 1927 for the purpose of constructing thereon a dwelling and other improvements for use as a part time residence and home on the banks of said natural stream, and for swimming and fishing in said stream and for agricultural purposes, and said site was selected because of the advantages it offered by abutting on said stream of water; that during the years 1927 and 1928 complainant constructed a dwelling and other improvements on said lands abutting said stream at a great cost, and thereafter used said premises as a private dwelling for himself and his family and used said stream for domestic, agricultural and other riparian uses and used said stream and the beach thereon for swimming, fishing and other forms of recreation. Said use has been continuous to the time of filing this bill of complaint except as limited by the acts hereinafter complained of.

"5. That prior to the year 1937 the said stream was clear, fresh and pure and suitable for the uses above described; it contained many species of game fish and was an excellent fishing ground; the beach on both sides of said stream was clean and suitable for use as a bathing beach. Said stream and the banks thereof were well adapted to all forms of recreation and the stream was in all respects pleasing and useful and contributed greatly to the value of said lands.

"6. That said stream because of seasonal rains and freshets periodically overflows its banks, and the waters therefrom spread over parts of the lands hereinbefore described.

"7. That respondent is, and has been for several years prior to the time of the filing of this bill of complaint, engaged in coal mining operations on the banks of said natural stream of water or a tributary thereto upstream from the lands of complainant described above; that for several years prior to the time of the filing of this bill, respondents have been using the waters of said stream or tributary for purposes of washing coal and cleansing from it coal dust, sludge, rock particles and other impurities and sediment; that said respondents are now maintaining and have continuously maintained for several years coal washers on the banks of said stream or tributary streams from which drain into said stream large quantities of water laden with great quantities of coal dust, sludge, mineral deposits and other impurities, sediments, and noxious foreign matter, thereby polluting said stream, rendering it unfit for use by complainant, corrupting and impairing its quality to the prejudice and injury of complainant and depriving complainant of the use thereof and of his natural easement in the flow of said waters in their natural state. In said operations other quantities of sludge and sediment are deposited on the banks of said tributary and are washed by the percolating and surface waters and by the natural overflows of said stream into said stream and thence down upon complainant's said lands and in the stream on which said lands of complainant abut.

"8. As a direct and proximate result of said operations described above, the said Little Cahaba River, as it flows through complainant's said lands is rendered unfit for domestic, culinary or agricultural uses, or for use for bathing; the water is greatly discolored and made unsanitary and noxious, unfit for cattle to drink and unfit as a place for fish to live. As a further proximate result of said operations, great quantities of sludge, coal dust, sediment and other noxious foreign matter are deposited on the banks of said stream as it glows [flows] through complainant's said lands and on the beach; and during the natural overflows of said stream large quantities of said filth and foul water are precipitated over complainant's said lands, and said filth deposited thereon with injurious effects upon the agricultural and horticultural plant life thereon, thus rendering said lands unfit for such uses, rendering them unsightly, and depriving complainant of the lawful use of his said lands."

Measured by the rules heretofore laid down by this Court, and adhered to for many years, the conclusion is inescapable that the bill of complaint states a cause of action, and that the trial court correctly overruled the demurrers to it.

Affirmed.

GARDNER, C. J., and BOULDIN, FOSTER, and STAKELY, JJ., concur.