790 So.2d 940 (2001)
RUSSELL CORPORATION
v.
Joe SULLIVAN et al.
Avondale Mills, Inc.
v.
Joe Sullivan et al.
Alabama Power Company
v.
Joe Sullivan et al.
1981074, 1981095 and 1981096.
Supreme Court of Alabama.
January 12, 2001.
*942 Hobart A. McWhorter, Jr., Norman Jetmundsen, Jr., David G. Hymer, Matthew H. Lembke, and Angus N. McFadden of Bradley, Arant, Rose & White, L.L.P., Birmingham, for appellant Russell Corporation.
Warren B. Lightfoot of Lightfoot, Franklin & White, L.L.C., Birmingham, for appellant Avondale Mills, Inc.
James A. Bradford, S. Allen Baker, Jr., and Alan T. Rogers of Balch & Bingham, L.L.P., Birmingham; David R. Boyd, Montgomery; and John P. Scott, Jr., of Starnes & Atchison, L.L.P., Birmingham, for appellant Alabama Power Company.
J. Gusty Yearout, Deborah S. Braden, and John G. Watts of Yearout, Myers & Traylor, Birmingham; M. Clay Ragsdale IV and M. Stan Herring, Jr., of Law Office of M. Clay Ragsdale IV, Birmingham, for appellees.
Robert A. Huffaker and Rachel Sanders-Cochran of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for amicus curiae Business Council of Alabama, in support of the appellants.
Rhonda Pitts Chambers of Rives & Peterson, Birmingham, for amicus curiae Alabama Defense Lawyers Ass'n, in support of the appellants.
Wade S. Anderson, Birmingham, for amici curiae Alabama Environmental Council and Sierra Club, Alabama Chapter.

On Application for Rehearing
HOOPER, Chief Justice.
The opinion of August 4, 2000, is withdrawn, and the following opinion is substituted therefor.
Russell Corporation ("Russell"), Avondale Mills ("Avondale"), and Alabama Power Company ("APCo") appeal from a judgment against them for property damage allegedly caused by the release of chemicals into Lake Martin. Russell and Avondale allegedly discharged chemicals in wastewater from their textile plants; that wastewater was then treated at the Sugar Creek Wastewater Treatment Plant ("Sugar Creek Plant"), a municipal wastewater treatment plant owned and operated by the City of Alexander City. After treatment at the Sugar Creek Plant, the wastewater, allegedly containing chemicals, was released into Sugar Creek, which flows into Lake Martin. APCo owns Lake Martin, a man-made lake APCo uses to generate power. Joe Sullivan and several other owners of property adjacent to Lake Martin sued Russell, Avondale, APCo, and the City of Alexander City,[1] alleging trespass *943 and nuisance arising out of the discharge of the chemicals. The jury returned verdicts awarding the plaintiffs $155,000 in compensatory damages and $52,000,000 in punitive damages against Russell, Avondale, and APCo. The trial court entered a judgment on those verdicts. We reverse the trial court's judgment and render a judgment for Russell, Avondale, and APCo.
Russell, Avondale, and APCo argue that the trial court erred in refusing to grant their motion for a judgment as a matter of law ("JML"), at the close of Sullivan's case-in-chief.[2] Rule 50(a), Ala. R. Civ. P. In determining whether to grant the defendants' motion, the trial judge considered "whether [Sullivan] ha[d] presented sufficient evidence to allow submission of the case or issue to the jury for a factual resolution." Liberty Nat'l Life Ins. Co. v. Allen, 699 So.2d 138, 140-41 (Ala.1997). In order to withstand the motion for a JML, Sullivan had to present "substantial evidence" supporting each element of trespass and nuisance. 699 So.2d at 141. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). In reviewing the trial court's denial of a motion for a JML, this Court must view the evidence in the light most favorable to the nonmovant and must entertain all reasonable inferences the jury would be free to draw. Liberty Nat'l Life Ins. Co. v. Allen, 699 So.2d at 141. However, conclusions based solely on conjecture and speculation will not support a jury verdict. Flagstar Enters., Inc. v. Davis, 709 So.2d 1132 (Ala. 1997).
The facts below were disputed; we present them in the light most favorable to Sullivan, the nonmovant, as we are required to do.

I. Facts

Russell and Avondale Mills operate textile plants in Alexander City. As part of their operations, they discharge directly into the Sugar Creek Plant large volumes of wastewater containing dyes used in processing textiles. After the wastewater is treated at the Sugar Creek Plant, it is discharged into Sugar Creek at a rate of five to six million gallons a day. This output flows through Sugar Creek, runs into Elkahatchee Creek, and, eventually, into Lake Martin. The plaintiffs are all residents of the Raintree subdivision located on Lake Martin.
The wastewater from Russell and Avondale constitutes 70-80% of the water treated daily at the Sugar Creek Plant. This wastewater contains dyes, salts, acid, surfactants, and heavy metals, making the water difficult to treat. At least one type of dye treated at the Sugar Creek Plant, azo dye, has been shown to have carcinogenic properties. The plaintiffs presented evidence indicating that the dyes, which are resistant to fading, are also difficult to remove from the wastewater during treatment. As a result of problems in removing color from the treated water, the City of Alexander City installed a chlorination/dechlorination facility at the Sugar Creek Plant.
*944 The Sugar Creek Plant uses an activated-sludge process to treat the wastewater. In that process, the waste is combined with oxygen and bacteria; it then forms a sludge that is removed from the water. The remaining water is decontaminated and is then discharged into Sugar Creek. The plaintiffs presented evidence indicating that because of the quantity and properties of the wastewater from Russell and Avondale, the Sugar Creek Plant experienced "bulking" problems. Bulking occurs where a chemical imbalance in the treatment process causes microbial and bacterial flocs, or floating sediments, to be discharged with the wastewater; normally contaminants would settle during treatment. As a result of the bulking, however, the plaintiffs say that sludge containing contaminants is discharged with the wastewater and settles at the bottom of Sugar Creek. This sludge contains fecal coliforms; it sometimes rises to the surface and floats on the water. Some of the plaintiffs complained that these flocs or floating sediment would cling to their piers. While the plaintiffs agree that the fecal coliforms in the flocs did not originate at Russell or Avondale, they claim that the Sugar Creek Plant failed to remove fecal coliforms from other wastewater treated at the plant because the bulking problems caused by the volume of Russell's and Avondale's wastewater allowed the biosolids from other sources of wastewater to pass through its system.
Testimony at trial indicated that the plaintiffs noticed the flocs floating in the lake water near their property. At times, they claim, the water was so stained by the dyes that it would color T-shirts. They claim the contaminated water lapped up onto the land, and that foam would form on the banks of the lake and around their piers. The plaintiffs testified that the contaminated water splashed onto their property when boats passed by or during storms. Dr. Joseph Gould, an expert witness for the plaintiffs, testified that the chlorination of the dyes during treatment at the Sugar Creek Plant created carcinogenic compounds that could be washed ashore. He testified that, although tests detected no such compounds in the surface water, the carcinogenic compounds were in the sludge. He testified that the natural churning of the water would periodically bring contaminants from the sludge to the surface and that the contaminants would then wash ashore and seep into the soil. However, the plaintiffs had no tests performed to see if any of these carcinogenic compounds or other contaminants were present on their property. No evidence was presented to indicate that the dyes or any of the components released by Russell and Avondale in their wastewater were actually found on any of the plaintiffs' properties. The plaintiffs relied on the testimony that waves and high waters could wash the materials ashore. The plaintiffs testified that because the water in Lake Martin is contaminated, their property is not as valuable as it could have been.
APCo owns Lake Martin up to the 490-foot contour line. This line extends onto the shore surrounding the lake. The property owners own the land above the 490-foot contour line. The plaintiffs testified that a property owner must obtain APCo's permission before he or she can construct a pier or a sea wall. No evidence was presented to indicate the precise location of this line on any of the plaintiffs' properties. The only evidence that the water may have ever risen above the 490-foot mark was the testimony of Larry Tuggle, vice-president of engineering for Russell. Tuggle stated: "We took samples when the lake was at high pool, which is 490. And we took samples when the lake was at low pool, which is about 480...."

*945 II. Alabama Power Company

The plaintiffs' claims alleging trespass and nuisance as to APCo must be considered separately from those claims against Russell and Avondale because APCo did not participate in the discharge of foreign materials into Lake Martin. The plaintiffs' action against APCo rests on the theory that APCo has a duty to keep Lake Martin clean, and that it breached that duty by allowing Russell and Avondale to discharge contaminants into Lake Martin.

A. Trespass

Trespass requires an intentional act by the defendant. See Born v. Exxon Corp., 388 So.2d 933, 934 (Ala.1980) ("It seems clear from Borland [v. Sanders Lead Co., 369 So.2d 523 (Ala.1979),] and Rushing [v. Hooper-McDonald, Inc., 293 Ala. 56, 300 So.2d 94 (1974)] that in order for one to be liable to another for trespass, the person must intentionally enter upon land in the possession of another or the person must intentionally cause some `substance' or `thing' to enter upon another's land.").
The plaintiffs argue that APCo committed trespass by allowing Russell and Avondale to discharge contaminants into Lake Martin and then by allowing those contaminants to remain on the bottom of the lake. The plaintiffs quote C.O. Osborn Contracting Co. v. Alabama Gas Corp., 273 Ala. 6, 7, 135 So.2d 166, 167 (1961):
"`Without question one may commit a trespass through another as his active agent or joint participant, although the one may not be present at the time, taking any personal hand in the trespass. He must be directing, aiding, participating in, or must ratify the trespass.'"
Quoting Trognitz v. Fry, 215 Ala. 609, 610, 112 So. 156, 157 (1927) (emphasis added). Osborn Contracting Co. dealt specifically with the distinction between an employer's liability for trespass based on the actions by an agent taken at the direction of the employer and an employer's liability for trespass on the case based on the actions of an agent not taken at the employer's direction. In this case, there is no agency a relationship between APCo, on the one hand, and Russell and Avondale, on the other. No evidence was presented to indicate that APCo directed Russell and Avondale to discharge their waste in any manner or to indicate that APCo aided or participated in the discharge. Therefore, there was no intentional act by APCo to support a claim of trespass.

B. Nuisance

The plaintiffs argue that APCo is liable because, they say, it permitted a nuisance to be created and maintained on its property. In order to prevail on this claim, the plaintiffs must show that APCo has a duty to control any discharge into Lake Martin.
APCo operates Lake Martin pursuant to a license issued by the Federal Energy Regulatory Commission ("FERC"). During the trial, the plaintiffs, over APCo's objection, placed that license in evidence. Article 19 of the FERC license provides as follows:
"In the construction, maintenance, or operation of the project, the Licensee shall be responsible for, and shall take reasonable measures to prevent, soil erosion on lands adjacent to streams or other waters, stream sedimentation, and any form of water or air pollution. The Commission, upon request or upon its own motion, may order the Licensee to take such measures as the Commission finds to be necessary for these purposes, after notice and opportunity for hearing."
(Emphasis added.)
The plaintiffs cannot rely on any duty created by the FERC license to support *946 their nuisance claim, for two reasons. First, when the defendants attempted to remove this action to a United States district court, the plaintiffs supported their motion opposing the removal with an affidavit of counsel stating that the plaintiffs were not alleging "any breaches of federal legislation, licenses or grants," and that prosecution of the "nuisance claim [did] not require the use of any license." Counsel also represented in the affidavit that the plaintiffs had neither pleaded nor sought to prove "violations of any federal laws." Having disclaimed reliance upon the FERC license, the plaintiffs cannot now be heard to say that, for the purpose of this litigation, that license created a duty on the part of APCo to prevent water pollution. Second, the exclusive forum for a violation of an FERC license is a United States district court. 16 U.S.C. § 825p.
The plaintiffs correctly note that Airco Alloys Division, Airco, Inc. v. Niagara Mohawk Power Corp., 411 N.Y.S.2d 460, 65 A.D.2d 378 (1978), stands for the proposition that simply because there is a related and perhaps relevant scheme of federal regulation, 16 U.S.C. § 825p does not preclude a traditional common-law claim. 411 N.Y.S.2d at 463, 65 A.D.2d at 382-83. However, the plaintiffs in Airco sought protection of a property right under a contract, leading the New York court to conclude that "[t]he ground for recovery is Contract NS 1, not the Act or the Federal power law, and New York courts may determine questions which may arise under the Federal power law when incidental to cases not arising under this law." 65 A.D.2d at 386, 411 N.Y.S.2d at 465. Here, the plaintiffs, in order to come under the circumstances recognized in Airco, must rely upon a traditional common-law theory, independent of the FERC license.
The Alabama Department of Environmental Management ("ADEM") regulates the environmental activities of Russell and Avondale. The wastewater from their plants is being discharged into Sugar Creek by the Sugar Creek Plant, and ultimately into Lake Martin, pursuant to valid ADEM permits. In Tipler v. McKenzie Tank Lines, 547 So.2d 438, 441 (Ala.1989), this Court found no liability where the plaintiff alleged that Exxon Corporation had created and maintained a public nuisance "either for maintaining, or for failing to prevent, a chain of events and circumstances over which [Exxon] had no reasonable means of control."
Where a plant discharges effluent into a stream that ultimately runs into a reservoir created by a dam, the owner of the reservoir cannot be liable for maintaining a nuisance, absent evidence indicating that it authorized or participated in the deposit of pollutants or that it had control over the deposits. Hood v. Slefkin, 88 R.I. 178, 143 A.2d 683 (1958), opinion adhered to on reargument sub nom. Winsten v. Slefkin, 88 R.I. 178, 150 A.2d 648 (1959). The only prong of this test that arguably might apply to APCo is the "control-over-the-deposits" prong. However, as previously noted, that control cannot be grounded upon the FERC license charging APCo with a duty to take reasonable measures to prevent water pollution. The record is devoid of any other basis for concluding that APCo had any control over the activities of Russell and Avondale.
We therefore reverse the trial court's judgment as to APCo and render a judgment for APCo on both the trespass claim and the nuisance claim.

III. Russell and Avondale

A. Trespass

In Rushing v. Hooper-McDonald, Inc., 293 Ala. 56, 300 So.2d 94 (1974), this Court held that an indirect trespass occurs where the trespasser releases a "foreign *947 polluting matter" beyond the boundaries of his property, knowing to a "substantial certainty" that it will invade the property.[3] In comparing direct trespass and indirect trespass, this Court, in Borland v. Sanders Lead Co., 369 So.2d 523 (Ala.1979), stated that a plaintiff need not show actual damage to prove direct trespass. However, the plaintiff must prove four elements to show an indirect trespass: "1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) substantial damage[ ] to the res." 369 So.2d at 529. In order to prove an indirect trespass, the plaintiffs here must show that "some substance has entered upon the land itself, affecting its nature and character, and causing substantial actual damage to the res." 369 So.2d at 530. (Initial emphasis added.)
In this case, whether water actually splashed onto the plaintiffs' property is sharply contested. As previously noted, the plaintiffs testified that water would splash onto their property when boats passed their property or during storms. However, none of the plaintiffs was able to state where his or her private property ended and APCo's property began. There was testimony from Larry Tuggle, a witness for the plaintiffs, that samples were taken when the water was at "high pool" and that "high pool" was at the 490-foot contour line; other witnesses testified that the lake was at "high pool" during a portion of each year. Therefore, the jury could reasonably have inferred that water from Lake Martin splashed onto the plaintiffs' properties.
The plaintiffs, however, acknowledge that they did not sue Russell, Avondale, and APCo merely because water from Lake Martin splashed onto their land. The plaintiffs argue that the trespass occurred because the water that splashed onto their land contained chemical contaminants that originated at Russell's and Avondale's plants. The evidence connecting the contaminants to the plaintiffs' property consisted of (1) tests that showed toxic substances in the sludge in the Sugar Creek basin, (2) testimony that color from the dyes used by Russell and Avondale stained the water, (3) testimony from Dr. Willard Blevins, an expert witness for the plaintiffs, that he saw divers bring sediment from the bottom of Lake Martin and that that sediment appeared to be sludge, (4) Dr. Gould's testimony that the chlorination techniques used at the Sugar Creek Plant ostensibly removed the dye from the wastewater, but that they actually increased the carcinogenic properties of the dyes, (5) Dr. Gould's testimony that the treatment plant was incapable of filtering out all of the carcinogenic compounds, and (6) Dr. Gould's testimony that the chemicals found in the sediment on the bottom of Lake Martin would from time to time rise as flocs and that if those flocs happened to be near the homeowners property, those chemicals would splash onto the property.
The foregoing evidence of contamination of the plaintiffs' properties is deficient in several respects; we must determine whether these deficiencies merely raise a jury question or whether they require a *948 conclusion that the evidence was insufficient, as a matter of law, to support a judgment for the plaintiffs.
Dr. Gould, the plaintiffs' expert witness, never tested the water being discharged from the Sugar Creek Plant. He never tested the water in that part of Lake Martin in the area of the Raintree subdivision or, indeed, in any part of Lake Martin. Dr. Blevins, another expert witness for the plaintiffs, never tested the sediment from the bottom of Lake Martin. The only tests Dr. Blevins conducted were in the Sugar Creek embayment, an area just before the confluence of Sugar Creek and Elkahatchee Creek. Neither expert for the plaintiffs tested the soil on the plaintiffs' property. The defendants, however, tested the water in Lake Martin in the area of the Raintree subdivision, as well as the soil in that area. The defendants tested these areas for the chemical compounds Dr. Gould testified would result from the chlorination of the dyes. They found no toxic chemicals. Dr. Gould testified that another carcinogenic compound could result from the chlorination process; however, he could not specify the compound. He also testified that he could not quantify an amount of the unspecified compound that would be present in the effluent discharged from the Sugar Creek Plant or in the sludge or that might rise to the top of the water.
The plaintiffs argue that the defendants tested for the "wrong" compounds. This argument, however, fails for three reasons. First, the defendants tested for the compounds the plaintiffs' expert witness, Dr. Gould, specified. Second, even though the defendants did not specifically test for azo dyes, the fact that the tests found no chemical components in the water or the soil indicates that it is highly improbable that azo dyesa chemical not tested for were the only chemicals to wash into the Raintree area of the lake. Third, it is not the defendants' burden to prove that no contamination occurred. The plaintiffs must prove that an invasion occurred. They say they failed to produce evidence of chemical contamination on their properties because of a "difficulty" in testing for the chemicals. They offered no evidence, however, as to the degree of difficulty in testing for the chemicals.
Viewed in the light most favorable to the plaintiffs, the evidence offered to show a trespass amounted to little more than inference upon inference. The jury was first asked to infer from the experts' conclusions, which were not based on testing of water or soil samples in the areas described in the plaintiffs' complaint, that the area is contaminated by an unidentified compound. Based on evidence indicating that Russell and Avondale use azo dyes in their textile processing, Dr. Gould opined that these dyes are discharged into the wastewater treated by the Sugar Creek Plant. Without testing the waters discharged from the Sugar Creek Plant, Dr. Gould then stated that the Sugar Creek Plant could not remove those chemicals from the wastewater. Without corroborating evidence from soil and water samples, the jury was then asked to infer that these chemicals traveled from the Sugar Creek Plant to the area of the Raintree subdivision on Lake Martin, and that they then washed onto the shores of the plaintiffs' properties.
As to the question whether there is sludge at the bottom of Lake Martin, Dr. Blevins testified that he saw a diver bring up "something black" from bottom of Lake Martin in the area of the Raintree subdivision, which he "envision[ed] being biosolids." Dr. Blevins concluded that what he saw indicated sludge at the bottom of Lake Martin in the Raintree area. However, neither Dr. Gould nor Dr. Blevins tested *949 this substance. The results of tests performed by CH2M Hill, an environmental consulting firm, for Alexander City from the samples Dr. Blevins saw being taken from the bottom of Lake Martin indicated the presence of no hazardous materials.
Evidence was presented indicating that the sediment at the bottom of the Sugar Creek embayment contained "potentially" toxic material. After the tests performed by CH2M Hill showed no contamination, a second series of tests were conducted at the Sugar Creek embayment. This testing consisted of obtaining samples of the darkest material found in the Sugar Creek embayment. According to CH2M Hill's report, this nonrandom sampling showed only what was contained in the darkest sediments, not what could be expected to be found in the Sugar Creek embayment as a whole. Testing of the darkest sediments showed some toxicity, possibly caused by the presence of ammonia and copper. According to the report: "The concentrations of copper and ammonia are in the range where toxic effects could be expected but are not sufficiently elevated to clearly implicate them." The test results did not show that the Sugar Creek embayment was permeated with toxins or that the results of a random sample would have indicated toxicity. No testing indicated toxins in any other part of Sugar Creek or in Lake Martin.
The United States Court of Appeals for the Fifth Circuit has held that, in an action alleging contamination of soil and water, the failure of experts to conduct studies on the plaintiffs' properties was fatal. Berry v. Armstrong Rubber Co., 989 F.2d 822 (5th Cir.1993). In Berry, the experts testified that chemicals traveled in the ground-water, contaminating the plaintiffs' soil and their well water. The Fifth Circuit Court of Appeals held that the experts' opinions were "not based on any studies done on plaintiffs' land." 989 F.2d at 827. The court held that the trial court had correctly entered a summary judgment in favor of the defendants:
"The court correctly noted that Dr. Pike's [a chemical engineer testifying for the plaintiffs] opinions were not based on tests he performed, or even tests of the properties at issue. Ms. Subra's [a chemist testifying for the plaintiffs] conclusions were not based on her own expert area of chemical analysis, and were not based on tests of the plaintiff's properties. Dr. Aughenbaugh [a professor of geotechnical engineering testifying for the plaintiffs] testified as a geochemist or hydrogeologist, areas in which he was not qualified, using data and methodology not recognized by experts in those fields.... The district court did not commit manifest error in ruling that these experts' opinions were insufficient to overcome summary judgment. See Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307, 312-13 (5th Cir.1989), cert. denied 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990)."
989 F.2d at 828.[4]
In Prescott v. Leaf River Forest Products, Inc., 740 So.2d 301 (Miss.1999), a case involving analogous facts, the Mississippi Supreme Court upheld a summary judgment in favor of Leaf River Forest Products, Inc., "against property owners along the Leaf River claiming damage[] resulting from chemical wastes deposited into the Leaf River during the operations of a pulp mill." 740 So.2d at 304-05. In that case, the property owners claimed that they had suffered mental anguish from the *950 fear of unknown future diseases; they also alleged trespass and nuisance based on their exposure to dioxin, and nuisance resulting from discoloration of the river and the sandbars. The trial court held that there was no evidence that the properties "were physically invaded by chemicals or that Leaf River was the source of any such chemicals." 740 So.2d at 306. The property owners argued that trespass could be proven by circumstantial evidence alone. The court upheld the summary judgment in favor of the defendants, stating that there was no scientific evidence showing that dioxin, the chemical at issue, was present on the properties.
In summary, several conclusions urged by the plaintiffs are unsupported by evidence: that the treatment technique at the Sugar Creek Plant was incapable of removing from the wastewater the unknown chemical alleged by Dr. Gould to be present in the wastewater and was incapable of removing the harmful components of azo dyes; that the sediment at the bottom of Lake Martin in the area of the Raintree subdivision contained "biosolids" and sludge; and that water movement would cause the particles of biosolids at the bottom of Lake Martin to rise to the top of the water from time to time. Based on these unsupported conclusions, drawn from a series of inferences ungrounded in scientific data and unsupported by the evidence, the plaintiffs asked the jury to infer (a) that the chemicals they allege were present rose to the top of the water, (b) that at the moment they rose to the surface, the water was at or above the 490-foot contour line, and (c) that the water then splashed onto the plaintiffs' properties, although no evidence of chemical contamination of the plaintiffs' properties was ever presented. Even if we were to hold that the experts' conclusions, which were not based on scientific data gained from tests performed at the site of the alleged contamination, supported a finding that toxic chemicals were present in some portion of Lake Martin, the jury, in order to find for the plaintiffs, would nevertheless have had to base its verdicts upon multiple inferences. This it may not do. The ultimate conclusion that any chemicals were deposited onto the plaintiffs' properties is, at best, speculative.
"`"[A]n inference cannot be derived from another inference." An inference must be based on a known or proven fact.'" Kmart Corp. v. Bassett, 769 So.2d 282, 287 (Ala.2000), quoting Khirieh v. State Farm Mut. Auto. Ins. Co., 594 So.2d 1220, 1224 (1992), quoting, in turn, Malone Freight Lines, Inc. v. McCardle, 277 Ala. 100, 107, 167 So.2d 274, 280 (1964). This Court has repeatedly held that "it is not permissible to build inference upon inference which leads to pure conjecture or guess." Johnson v. Louisville & N.R.R., 240 Ala. 219, 225, 198 So. 350, 354 (1940).
The lack of scientific evidence indicating the presence of any chemicals causing "actual substantial damage" to the plaintiffs' properties or to support any of Dr. Gould's opinions is fatal to the plaintiffs' trespass claims. Borland, 369 So.2d at 529. The plaintiffs failed to carry their burden; they failed to prove substantial actual damage caused by the presence of any chemical. See Borland, 369 So.2d at 530. The plaintiffs' failure to present such evidence entitled Russell and Avondale to a judgment as a matter of law on the trespass claims.[5]

*951 B. Nuisance

"A `nuisance' is anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful or such as would affect only one of fastidious taste, but it should be such as would affect an ordinary reasonable man."
Ala.Code 1975, § 6-5-120. This statute is a codification of Alabama's common-law nuisance principles. This Court has recognized that even a lawful and careful activity, when combined with culpable acts, constitutes a nuisance if the activity hurts, inconveniences, or damages the complaining party. See Tipler v. McKenzie Tank Lines, supra. Therefore, although Russell and Avondale argue that their actions were in accordance with state and federal regulations and that they were permissible under various permits, the plaintiffs may still maintain an action against Russell and Avondale if they can prove the elements of nuisance.
In Alabama, a nuisance can be either private or public. "A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals." Ala.Code 1975, § 6-5-121; Hunter-Benn Co. v. Nelson, 267 Ala. 472, 103 So.2d 783 (1958).
The distinction between a private nuisance and a public nuisance is an important one. "A private nuisance gives a right of action to the person injured" while "a public nuisance gives no right of action to any individual, but must be abated by a process instituted in the name of the state." Ala.Code 1975, § 6-5-121. However, an individual may have a cause of action under a public-nuisance theory if that individual suffered a "special damage... in which the public does not participate." Ala.Code 1975, § 6-5-123. In order to support an individual's cause of action for a public nuisance, the nuisance must cause a "special damage" that is different in "kind and degree from [the damage] suffered by the public in general." City of Birmingham v. City of Fairfield, 375 So.2d 438, 441 (Ala.1979); Ala.Code 1975 § 6-5-123. Therefore, if the nuisance allegedly created by the discharge of wastewater into Sugar Creek, and ultimately into Lake Martin, is a public one, the plaintiffs in this case must show that the discharge has caused them special damage, i.e., damage that is different than that suffered by others.
In Stone Container Corp. v. Stapler, 263 Ala. 524, 83 So.2d 283 (1955), evidence was presented that a public stream would often flood and that after the floodwater receded, large sheets of pulp waste would remain in the plaintiffs yard. The waste matter would trap water; it would then become stagnant and a breeding ground for mosquitos, which would invade the plaintiffs property and annoy him and his guests. The court held that the plaintiff could maintain an action based on a public-nuisance theory because he suffered "special damage" different than others affected *952 by the flooding. The plaintiffs in the present case, however, have presented no evidence indicating such special damage. The plaintiffs alleged that Russell's and Avondale's actions resulted in the loss of the use and enjoyment of Lake Martin.
The plaintiffs claim that the nuisance they suffered was a private nuisance. In support of this theory, they rely on this Court's holding in Elmore v. Ingalls, 245 Ala. 481, 17 So.2d 674 (1944). In their brief, they quote the following paragraphs from Elmore:
"`The old maxim, "Aqua curritt, et debet currere ut solebat," is familiar to all. It means, in practical application, that water is the common and equal property of every one through whose domain it flows, and that the right of each to its use and consumption, while passing over his possessions is the same. He must so use it as not to destroy or unreasonably impair the equal rights of others. "Sic utere tuo ut alienum non ledas" ["use your own property in such a manner as not to injure that of another"] is the law's mandate in such conditions....'
". . . .
"`In Gould on Waters, it is declared that actions may be maintained for the following causes: "The casting upon one's own land of dirt and foul water, or substances which reach the stream by percolation; ... in letting off of water made noxious by precipitation of minerals,... or rendering the water unfit for domestic, culinary, or mining purposes or for cattle to drink of, or fish to live in, or for manufacturing purposes.'"
245 Ala. at 482-83, 17 So.2d at 674-75 (quoting Tennessee Coal, Iron & R.R. v. Hamilton, 100 Ala. 252, 14 So. 167 (1893)) (bracketed language added). The plaintiffs' reliance on Elmore, however, is misplaced. In Elmore, as in Tennessee Coal, Iron & R.R., the water in question flowed through the plaintiffs' property. The creek or streambed belonged to the plaintiffs; as a result, the plaintiffs had a right to the water as it flowed through their properties. In this case, the plaintiffs own no part of Lake Martin. They did not suffer the type of damage anticipated where contaminated water causes a nuisance on someone's property as the water passes across the land. For this reason, the plaintiffs' private-nuisance claims must fail.[6]
Russell and Avondale correctly argue that the nuisance, if any, is a public nuisance, because, they say, the alleged nuisance is in the water of Lake Martin, a public waterway whose bed is owned solely by APCo. The discharge of contaminants into a public body of water constitutes a public nuisance. See National Container Corp. v. State, 138 Fla. 32, 189 So. 4 (1939); and People of the State of New York v. State of New Jersey, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921). Russell and Avondale argue that the plaintiffs never proved that the alleged nuisance prevented them from using or enjoying their "own" property. While the plaintiffs offered evidence that they were unable to use and enjoy the lake, the use and enjoyment of a public area is a public right.[7]Id. The *953 alleged nuisance in this case affects anyone who would want to use and enjoy Lake Martin, not just those who live on its banks. Any nuisance caused by the discharge of contaminated wastewater into Lake Martin is a public, not a private, nuisance.
Because the plaintiffs expressly waived any claim to recovery under a public-nuisance theory,[8] thereby avoiding the necessity of proving that they suffered special damage not suffered by members of the general public, it is unnecessary to address whether the record contains substantial evidence of such damage.[9]

IV. Conclusion

The trial court erred in denying Russell, Avondale, and APCo's motion for a judgment as a matter of law. Therefore, its judgment is reversed and a judgment is rendered in favor of Russell, Avondale, and APCo.
APPLICATION OVERRULED; OPINION OF AUGUST 4, 2000, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND JUDGMENT RENDERED.
MADDOX, HOUSTON, SEE, LYONS, and BROWN, JJ., concur.
COOK and JOHNSTONE, JJ., concur as to Part II and dissent as to Part III, and dissent from the denial of rehearing.
ENGLAND, J., concurs as to Part II, dissents as to Part III.A., and concurs in part and dissents in part as to Part III.B., and dissents from the denial of rehearing.
*954 COOK, Justice (concurring as to Part II and dissenting as to Part III).
The majority reverses a judgment entered on jury verdicts in favor of the plaintiff-landowners and against Russell Corporation ("Russell"), Avondale Mills ("Avondale"), and Alabama Power Company ("APCo") and renders a judgment for Russell, Avondale, and APCo; it does so on the ground that the landowners failed to carry their burden of proof as to their claims of trespass. I agree that APCo was entitled to a judgment as a matter of law on both the trespass claim and the nuisance claim. As to the majority's disposition of those claims against Russell and Avondale, however, I respectfully dissent.

I. Trespass
The majority concludes that the plaintiffs failed to prove that they suffered an actionable invasion of their properties. This conclusion is inexplicable in view of what the majority's summary of the evidence presented. In particular, the majority says that evidence was presented indicating the following facts: The water from Lake Martin splashes upon the plaintiffs' property. Russell and Avondale discharge wastewater into Lake Martin at a rate of "five to six million gallons a day." 790 So.2d at 943. "This wastewater contains dyes, salts, acid, surfactants, and heavy metals." Id. These dyes, at least one of which has been demonstrated to be a carcinogen, escape the treatment process at the Alexander City Sugar Creek Wastewater Treatment Plant (the "Sugar Creek Plant"), and, consequently, are released into Sugar Creek, which, in turn, empties into Lake Martin. Id. These dyes also cause a sludge to form, which, in turn, creates "floating sediments" called "flocs." Id. at 944. The flocs are composed of biosolids containing fecal coliforms. The sludge regularly passes through the Sugar Creek Plant into Lake Martin, where the flocs form around the plaintiffs' piers. Id. The water that splashes upon the plaintiffs' property is so heavily contaminated with dye that "it would color T-shirts." Id. Finally, the plaintiffs' property is "not as valuable as it could have been" because the water is contaminated. Id. at 954.
This evidence, conceded by the majority, was more than sufficient to justify the jury's determination that Russell and Avondale had indirectly trespassed upon the plaintiffs' properties by discharging wastewater "with knowledge that it [would] to a substantial certainty result in entry of foreign matter," Rushing v. Hooper-McDonald, Inc., 293 Ala. 56, 59, 300 So.2d 94, 97 (1974) (quoting with approval Restatement (Second) of Torts § 158 comment i.), in this case obnoxious dyes and fecal coliforms, upon the plaintiffs' property. Thus, the majority's holding that Russell and Avondale were entitled to a judgment as a matter of law on the plaintiffs' trespass claim is legally and factually untenable. As to that holding, therefore, I dissent.

II. Nuisance
The majority's disposition of the plaintiffs' nuisance claims against Russell and Avondale is also untenable. The majority concludes that, as a matter of law, this case involves a public, as opposed to a private, nuisance. I disagree.
These plaintiffs, landowners in the Raintree subdivision bordering Lake Martin, have sufficiently alleged and proven that they fall within the class of individuals entitled to maintain a private-nuisance action. They live in an area that represents, they say, "less than one percent" of the area of Lake Martin. According to testimony, they live in an area, in which, because of the shape of the lake, the pollutants discharged by Russell and Avondale tend to "accumulate." Indeed, the plaintiffs *955 presented aerial photographs showing that the presence of visible dye in the water was restricted to the section of Lake Martin on which they live. There was testimony that, in addition to, and in connection with, the presence of the flocs, the water that splashes upon their property emits a foul odor. Obviously, these property ownersunlike the public in general are unable to avoid the noxious odors and various assaults on the senses that result from the wastewater discharge by Russell and Avondale. In short, the plaintiffs have established a private-nuisance claim. See Monsanto Chemical Co. v. Fincher, 272 Ala. 534, 133 So.2d 192 (1961); Strickland v. Lambert, 268 Ala. 580, 109 So.2d 664, (1959).

III. Conclusion
This Court should be addressing whether the punitive damages awarded in this case are consistent with the standards set forth in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), rather than rendering a judgment for Russell and Avondale. To the extent that it does so, I respectfully dissent.
JOHNSTONE, J., concurs.
ENGLAND, Justice (concurring as to Part II, dissenting as to Part III.A, and concurring in part and dissenting in part as to Part III.B.).
Part II of the majority's opinion reverses the judgment of the trial court and renders a judgment in favor of APCo. I concur in Part II of the majority opinion.
I dissent as to Part III.A.; I concur with Justice Cook's special writing on that issue.
While I agree with the majority's conclusion in Part III.B. that the plaintiffs cannot maintain a private-nuisance action, I do not agree with its conclusion that the plaintiffs expressly waived any claim to recover under a public-nuisance theory as individuals who suffered "special damage," i.e., damage different in kind or degree from the damage suffered by the general public. The question whether the plaintiffs indeed waived such a claim is crucial in this case. In footnote 8, the majority quotes a dialogue between the court and counsel for the plaintiffs and the defense as support for its conclusion that the plaintiffs had expressly waived any right to recover under a public-nuisance theory. There was, however, no such express waiver. To take the language quoted in footnote eight as a waiver of any claims the plaintiffs' might have as individuals to allege a public nuisance based on "special damage" is taking the waiver too far.
The trial court properly instructed the jury on trespass. However, the trial court erred in instructing the jury on the doctrine of private nuisance. The trial court should have instructed the jury on an individual's right to bring an action for public nuisance if the individual could prove special damage. Because it is unclear whether the verdict for Russell and Avondale in this case was based on the good count, i.e., the trespass count, or on the bad count, i.e., the private-nuisance count, the judgment for Russell and Avondale must be reversed and the cause remanded for a new trial. See Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981). Thus, I would reverse the judgment of the trial court in favor of Russell and Avondale and remand the cause for a new trial as to those defendants rather than reverse and render a judgment for them, as the majority has done.
NOTES
[1] Alexander City was originally a party to this action because the wastewater from Russell and Avondale is treated at Alexander City's Sugar Creek Plant. In Ex parte Alabama Power Co., 640 So.2d 921 (Ala.1994), we held that venue as to Alexander City was proper only in Tallapoosa County. The plaintiffs then dismissed Alexander City as a party, and the case remained in the Circuit Court of Jefferson County. Subsequent attempts by APCo to join Alexander City as a third-party defendant were unsuccessful. See Ex parte Russell Corp., 703 So.2d 953, 956 (Ala.1997).
[2] Russell, Avondale, and APCo also argue that the trial judge engaged in misconduct during the proceedings. They claim that, among other things, he made erroneous evidentiary rulings, that he treated defense witnesses with disrespect, that he had improper contact with the jurors during deliberations, and that his jury instructions on punitive damages were incorrect.
[3] Justice Cook's dissent emphasizes the presence of fecal coliforms in the wastewater released by the Sugar Creek Plant. While evidence suggests that "bulking" may cause the Sugar Creek Plant to fail and that that failure causes biosolids and fecal materials to be released into Sugar Creek, neither Russell nor Avondale has released such materials into the wastewater, and this type of material does not originate in their textile operations.
[4] The defendants objected to Dr. Gould's testimony on the grounds that Dr. Gould was not qualified to testify concerning the movement of water in Lake Martin. Because of our holding in this case, we need not address this issue.
[5] Justice Cook's dissent cites Rushing v. Hooper-McDonald, Inc., 293 Ala. 56, 300 So.2d 94 (Ala.1974), for the proposition that there must be an "entry of foreign matter" to support a claim of indirect trespass. However, it overlooks the distinction between direct trespass and indirect trespass made in Borland, especially the requirement that to support an indirect trespass there must be substantial actual damage to the res. The dissent erroneously concludes that the dyes and fecal coliforms constitute sufficient evidence of an invasion causing substantial actual damage. As previously noted, no evidence was presented indicating that any dyeseither carcinogenic or otherwisewere present on the plaintiffs' properties. Also, as for the presence of fecal coliforms, not only was there no evidence of their presence on the plaintiffs' properties, there was no evidence that Russell and Avondale had released any fecal coliforms into their wastewater.
[6] Justice Cook notes that evidence in the form of aerial photographs was presented showing discoloration in parts of Lake Martin; this evidence, however, shows the condition of adjacent public property, i.e., Lake Martin, and not the condition of the plaintiffs' property. As noted, the plaintiffs have no claim under these circumstances.
[7] Justice Cook's dissent relies heavily on the inference that the pollutants "accumulate" only in that area of Lake Martin near the Raintree subdivision. The evidence in this case showed no pollutants, originating from Russell or Avondale, other than stains from some of the dyes, in the area of the Raintree subdivision. The dissent does not acknowledge the fact that if the pollutants "accumulate" in the area of the Raintree subdivision, they must first travel through several miles of public waterwaysSugar Creek and Elkahatchee Creekand that the Raintree area of Lake Martin is as open to the public as other portions of the lake. Conceding, for the sake of argument, that pollutants accumulate only in the area of the Raintree subdivision, this circumstance would be relevant only to a theory of recovery grounded upon a private cause of action for a public nuisance. However, as already discussed, any such claim has been expressly waived.
[8] "THE COURT: ... Before we get to it, the Defendants had addressed public nuisance. The plaintiffs are not suing for public nuisance?

"MR. RAGSDALE [plaintiffs' attorney]: No.
"MR. BRADFORD [defense attorney]: Was that a no?
"MR. HYMER [defense attorney]: Judge, we've addressed it in the sense that we've asked for a charge that because the plaintiffs would not be entitled to recover anything for public nuisance, so our requested charge is that the jury must decide that it is a private nuisance as opposed to a public nuisance before they're entitled to award damages for nuisance.
"THE COURT: Okay.
"MR. HYMER: That's the gist of our charge
"MR. YEAROUT [plaintiffs' attorney]: The reason we object to the charge, excuse me.
"MR. HYMER: Or that the plaintiffs have suffered some special injury as a result of the public nuisance before they can recover.
"MR. YEAROUT: All the same, you don't put into a charge a negative that nobody is trying to prove, you know? I meant we're trying to prove it's a private nuisance and that's what this is about, I don'tI suggest it would be a misleading charge."
(R. at 4020-22.) (Emphasis added.)
[9] In his dissent, Justice Cook refers to the presence of "noxious odors and various assaults on the senses" that these property owners suffered. Such injuries are actionable only if the plaintiffs are affected differently than the general public under the theory of a special injury flowing from a public nuisance. However, as noted above, the plaintiffs waived any claim based on a public-nuisance theory.