This case involves a traffic accident in which Johnny Dean McKelvey, one of the drivers of the two vehicles involved in the accident, died as a result of the injuries he sustained in the accident. Gloria Dean Belew, the administrator of the estate of Johnny McKelvey, appeals from the Lauderdale Circuit Court's judgment entered on a jury verdict in favor of Joe Patrick Nelson, the driver of the other vehicle involved in the accident, and Nelson Loader Service, a business wholly owned by Nelson. We affirm.
On the morning of July 17, 2000, Johnny Dean McKelvey and his wife, Deborah Jean McKelvey,[1] left their home and drove to Florence for the purpose of paying certain bills. On their way home, around noon, they stopped at a restaurant called LaFonda's for lunch. During lunch, Mr. and Mrs. McKelvey each ordered two drinks known as "the Bull." The Bull is a combination of a Dos Equis beer, tequila, triple sec (an orange-flavored liqueur), and lime. Mr. McKelvey consumed one and a half of the drinks, while Mrs. McKelvey consumed two and a half of the drinks. Mr. and Mrs. McKelvey remained at the restaurant for approximately an hour and a half.
After lunch, Mrs. McKelvey felt too impaired from the alcohol to drive, so Mr. McKelvey drove. Because they enjoyed their drinks from lunch, they stopped at a liquor store and purchased the ingredients to make them at home. On their way home after they left the liquor store, they turned onto Highway 76, traveling east on that road.
On the same day, as part of his job, Nelson was driving his dump truck west on Highway 76. As Nelson and the McKelveys were rounding a curve on Highway 76, their vehicles collided. The curve bore to the right for Nelson, and to the left for the McKelveys. Skid marks left by Nelson's dump truck on the highway indicated that he applied his brakes while his truck was still entirely in his lane of travel but that his truck continued in a straight line during the skid so that, because *Page 112 
the road curved to the right, his truck crossed the center line and collided with the McKelveys' car in the McKelveys' lane of travel. Mr. McKelvey died as a result of the injuries he sustained in the accident.
On July 15, 2002, Belew, as administrator of Mr. McKelvey's estate, instituted an action against Nelson and Nelson Loader Service (hereinafter collectively referred to as "the defendants") alleging a wrongful-death claim. The defendants answered the complaint, denying all the material allegations thereof. The defendants filed a motion for a summary judgment, which the trial court denied.
On November 16, 2004, the court held a jury trial. As to the cause of the accident, the testimony was conflicting. Nelson testified that, as he was approaching the curve, he saw that the McKelveys' car was entirely in his lane of travel and that, to avoid hitting them, he slammed on his brakes. He testified that there were two impacts between his truck and the McKelveys' car. The first, he testified, occurred in his lane of travel and involved the front of his truck striking the McKelveys' car. The second, he testified, occurred in the McKelveys' lane of travel when the back of his truck, because the truck had begun to spin after the initial impact, slid into the McKelveys' lane of travel. He testified that the only time his truck entered the McKelveys' lane of travel was when, after the initial impact, his truck began to spin out of control.
Mrs. McKelvey, on the other hand, testified that the McKelveys' vehicle never left the eastbound lane of travel and was never in Nelson's lane of travel. She admitted on cross-examination that she was turned toward and talking to her husband right before the accident occurred and that her attention was directed at him at that point.
The only other witness to testify at trial was Truman Jones, who, at the time of the accident, was an Alabama State Trooper. Jones testified that he was called to the scene of the wreck to investigate the accident. As to his qualifications to investigate accidents, he testified that, in addition to the training he received when he became a state trooper, he was trained at a traffic-homicide-investigation school in 1996, which included an 80-hour course in advanced accident investigation that was designed to enable him to determine, based on the evidence at the scene of an accident, how the accident had occurred. Trooper Jones testified that he had investigated over 2000 accidents during his 10 years as a trooper before the McKelvey/Nelson accident. In addition, he had conducted between 15 and 20 homicide investigations during the period after he graduated from the traffic-homicide-investigation school until the McKelvey/Nelson accident.
Trooper Jones testified that, in reaching his ultimate conclusion as to what happened with regard to the McKelvey/Nelson accident, he considered the skid and yaw marks[2] that each vehicle left on the pavement, *Page 113 
the damage to the vehicles, and the final resting place of the vehicles. Additionally, he and the other trooper at the scene of the accident placed their vehicles over the skid and yaw marks at the point of impact in order to determine the angles of the vehicles at the moment of impact, a technique on which he had received instruction.
Trooper Jones testified that before the impact Nelson's truck left skid marks that began in his lane of travel and continued in a straight line across the center line of the road and into the McKelveys' lane of travel. He testified that before the impact the McKelveys' car left a yaw mark that began in Nelson's lane of travel and ended in the McKelveys' lane of travel. Specifically, he testified:
 "Q. Okay. And were you able to determine anything in regard to the vehicle driven by Mr. McKelvey that may not be show up in this photograph?
 "A. There was faint, what I would call a yaw mark, which is a tire that is still rolling that is in a side skid. It leaves diagonal striations on the asphalt. And we did see faint yaw marks.
". . . .
"Q. How would they have been angled?
"A. They were angling in this direction.
 "Q. From the [westbound] lane into the eastbound lane? This is west, and this is east?
 "A. Yes, coming from the westbound back into the eastbound.
 "Q. So some of this yaw mark was in the westbound lane?
"A. Correct.
"Q. And some of it was in the eastbound lane?
"A. Yes.
"Q. Crossing over the center line?
"A. Yes."
Trooper Jones testified that, based on the physical evidence and the consideration of the angles of the vehicles at the moment of impact, he determined: (1) that Nelson's truck was entirely in his lane of travel when he applied his brakes; (2) that the McKelveys' vehicle had crossed the center line of the highway and was in Nelson's lane of travel; and (3) that, at impact, although the front of the McKelveys' vehicle had returned to the McKelveys' lane of travel, the majority of their vehicle remained in Nelson's lane of travel.
The jury returned a verdict in the defendants' favor. On November 19, 2004, the court entered a judgment on that verdict. Belew appeals.
Belew contends that the trial court erred when it allowed Trooper Jones to testify regarding the relative positions of Nelson's and the McKelveys' vehicles before their impact. While she does not challenge Trooper Jones's credentials as an expert witness, she sets forth a number of separate arguments challenging the permissibility of an expert to testify to the position of automobiles before an accident and challenging the underlying basis of Trooper Jones's opinion that the McKelveys' automobile was in Nelson's lane of travel before the accident. As detailed below, we must reject each of Belew's challenges to Trooper Jones's testimony.
Rule 702, Ala. R. Evid., governs the admissibility of expert testimony. That rule provides:
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to *Page 114 
determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."[3]
Our Supreme Court has explained the standard by which we review challenges to a trial court's having allowed a witness to offer expert testimony: "`A determination of whether a witness qualifies as an expert rests largely in the discretion of the trial judge, and that determination will be reversed only if found to be palpably wrong.'" Weeks v. Danford, 608 So.2d 387,388 (Ala. 1992) (quoting Macon County Comm'n v. Sanders,555 So.2d 1054, 1058 (Ala. 1990)). The Court has defined an "expert" as "`"anyone whose opportunity or means of knowledge in a specialized art or science is better than that of the average juror or witness," such that the expert's testimony will aid the jury.'" Weeks, 608 So.2d at 388 (quoting Sanders,555 So.2d at 1058).
Belew argues that the court should not have permitted Trooper Jones to testify regarding the relative positions of the vehicles involved in the accident before impact. She bases this contention on the Supreme Court's decision in White v. State,294 Ala. 265, 271, 314 So.2d 857, 862 (1975), in which the Court held that "an expert is not allowed to testify as to the relative positions of the parties at the time a shot is fired." The rule in White
is not applicable to the present case, however, and Belew's reliance on White is misplaced.
The rationale for the rule set forth in White was stated inRigell v. State, 8 Ala.App. 46, 62 So. 977 (1913):
 "`According to the overwhelming weight of authority, the opinions of medical experts are not admissible to show the position of an injured person at the time the wound was received, or the position of the person who inflicted it, because, as has been said, surgeons are not presumed to be experts in the matter of giving or receiving wounds, and the jury [is] equally capable of drawing proper inferences from the facts proved.'"
Rigell, 8 Ala.App. at 55, 62 So. at 980 (quoting Vol. 5, p. 588, of the Encyclopedia of Evidence). Unlike in the case of a shooting, where laypersons are just as qualified as medical or other experts to review the evidence of bullet trajectory in order to determine the position of the parties before the shooting, we find that the *Page 115 
expert testimony of Trooper Jones with regard to determining the position of the vehicles before the accident was properly admitted.
As the facts in this case demonstrate, there are important distinctions between the types of marks that vehicles leave on the road (see note 2, supra) of which the average layperson would not be aware. In addition, Trooper Jones had received training as to how to determine the angle of vehicles in an accident at the time of a collision, allowing for a reasonable determination of their positions before the accident. We cannot find that the ability demonstrated by Trooper Jones in this case to determine the angles of automobiles at impact based on the physical evidence at the scene of an accident is the type of knowledge that an ordinary layperson possesses. Thus, we find that the rule in White is not applicable here. Cf. Dyer v.Traeger, 357 So.2d 328, 329-30 (Ala. 1978) (investigating officer allowed to offer expert testimony regarding point of impact of vehicles in accident).
Belew next discusses our Supreme Court's decision in McWhorterv. Clark, 342 So.2d 903 (Ala. 1977), and argues thatMcWhorter, in which the Supreme Court held that the trial court should have excluded certain expert testimony from an officer, "is not dissimilar to the case at bar." We conclude thatMcWhorter is, in fact, dissimilar to the present case.
In McWhorter, our Supreme Court reversed the trial court's judgment based on its failure to exclude expert testimony from an officer regarding the speed that two vehicles had been traveling before a crash. McWhorter, 342 So.2d at 904. The Court pointed out that the rule in Alabama is that an expert may testify regarding the estimated speed of vehicles based on the distance that their tires skidded before the impact; however, the testimony cannot be based on evidence related to how far the vehicles traveled after the impact. Id. (citing Maslankowskiv. Beam, 288 Ala. 254, 259 So.2d 804 (1972)). Noting that the officer's testimony "was based entirely on the distance between the point of impact and the distance to the car after it came to a halt," the Court held that the inclusion of the officer's testimony violated the above-cited rule and was therefore improper. 342 So.2d at 904.
Belew asserts that the Supreme Court rejected the officer's testimony in McWhorter because his testimony was based on "impermissible inferences," which, she argues, is similar to the testimony of Trooper Jones because Trooper Jones "was not even sure that the [yaw] marks were left by the McKelvey vehicle." As noted above, however, the Supreme Court rejected the officer's testimony in McWhorter because it violated the rule that experts cannot opine as to the speed of a vehicle before an accident on the basis of where the vehicle comes to rest after an accident, not because the officer expressed uncertainty with regard to the physical evidence at the scene of the wreck. Second, and more importantly, Trooper Jones never indicated any uncertainty in his testimony as to the location of the yaw marks that the McKelveys' car left on the pavement before the accident. Although Belew's attorney attacked the credibility and reliability of Trooper Jones's testimony in this regard, Trooper Jones never indicated that he was uncertain about the location of the yaw marks or about the fact that the McKelveys' vehicle left the yaw marks that he testified were in both of the lanes of travel.[4] Thus, Belew's reliance on McWhorter is misplaced. *Page 116 
Belew argues that Trooper Jones reached his conclusion that the McKelveys' car was in Nelson's lane before the accident despite the fact that the accident occurred on the McKelveys' side of the road, and despite the fact that there was not "a single skid mark or [yaw] mark made by McKelvey on Nelson's side of the road." "In fact," Belew asserts, "not a single piece of physical evidence at the scene would have permitted an expert, short of a bona fide accident reconstructionist, to opine that the McKelvey vehicle was on Nelson's side of the road."
We cannot agree with Belew's recitation of the evidence. Trooper Jones testified that the McKelveys' car left a yaw mark that began in Nelson's lane of traffic, crossed the center line dividing the lanes, and finished in the McKelveys' lane of traffic. Trooper Jones further explained what a yaw mark is and the circumstances under which a car leaves such a mark on the road. Based on this physical evidence, as well as on his examination of the direction in which the automobiles were facing at the time of the accident, Trooper Jones concluded that the McKelveys' car had been in Nelson's lane of travel and, just before the accident, returned, at least in part, to the McKelveys' lane of travel. Belew's assertion that there was no physical evidence indicating that the McKelveys' car had been in Nelson's lane of travel before the accident is incorrect.
Belew also argues that Trooper Jones's opinion was based on an inference that was derived from another inference, which, she asserts, is impermissible, citing Russell Corp. v. Sullivan,790 So.2d 940 (Ala. 2001). According to Belew
 "[t]he flaw in [Trooper Jones's] opinion [regarding the location of the McKelveys' car before the accident] is that no [yaw] marks, or marks of any kind, were left in Nelson's lane of travel. The only [yaw] marks that were possibly left by McKelvey were in his lane of travel. Therefore, the trooper not only had to infer that the marks were left by McKelvey, but upon that inference drew a second inference that based upon the location of the [yaw] marks in McKelvey's lane, inferred that McKelvey's vehicle was in Nelson's lane of travel."
Again, however, Trooper Jones testified at trial that the McKelveys' car left yaw marks in both lanes of travel.[5]
This evidence eliminates one of the two inferences that Belew argues was made by Trooper Jones in reaching his ultimate opinion. As a result, her argument that Trooper Jones's opinion constitutes an inference based on an inference is without merit. *Page 117 
Belew next contends that the trial court erred in charging the jury as to voluntary intoxication, despite, she argues, the fact that there was no evidence presented that Mr. McKelvey was intoxicated. Alabama Pattern Jury Instruction-Civil 30.04, which the trial court read to the jury and about which Belew complains, reads:
 "A person who voluntarily becomes intoxicated is required to exercise the same degree of care as is required of a sober person under the same or similar circumstances. It is proper for you to consider whether or not the plaintiff was intoxicated, together with all other facts and circumstances, in determining whether or not the plaintiff was contributorily negligent at the time of the occurrence."
Belew asserts that there are no Alabama cases directly on point with regard to the issue she presents, and, therefore, she cites cases from other jurisdictions for the proposition that a charge on voluntary intoxication is appropriate only when there is evidence of actual intoxication, not just consumption of alcohol. We find, however, that Alabama law is sufficiently developed on this issue such that reliance by this court on caselaw from other jurisdictions is inappropriate.
When contributory negligence is an issue, a jury charge on voluntary intoxication is appropriate when there is evidence of intoxication, because "[i]ntoxication is relevant to the issue of negligence." Robinson v. Harris, 370 So.2d 961, 967 (Ala. 1979). Consumption of alcoholic beverages is relevant evidence of intoxication. Id.; Chattahoochee Valley Ry. Co. v. Williams,267 Ala. 464, 470, 103 So.2d 762, 766 (1958). The weight to be given any such evidence is, of course, a matter for the trier of fact. Further, the relevance of such evidence is subject to the rule of remoteness: "Proof of prior consumption of intoxicating beverages is logically relevant to prove intoxication at a later time unless such drinking occurred at a time too remote to prove the alleged later intoxication." Williams, 267 Ala. at 469,103 So.2d at 766. Whether consumption of alcohol occurred at a time too remote to constitute evidence of intoxication must be determined on a case-by-case basis. Id.
In addition to consumption of alcoholic beverages, the Supreme Court has held that evidence of driving one's car on the wrong side of the road, even when the issue of negligence is the ultimate issue in the case and is in dispute, can, when coupled with other evidence, lead to the conclusion that the driver of the car was intoxicated. Kingry v. McCardle, 266 Ala. 533,537-38, 98 So.2d 44, 47-48 (1957).
In the present case, evidence was presented indicating that Mr. McKelvey, during a lunch that occurred just before the accident at issue, consumed at least one and a half drinks[6] that consisted of a beer and two types of liquor. The jury was shown the size and type of glass in which those drinks were served. Evidence was also presented indicating that Mr. McKelvey drove his car on the wrong side of the road immediately before the accident. Based on these circumstances and our Supreme Court's holdings in Robinson, Williams, and Kingry, we cannot conclude that it was inappropriate for the jury to consider the issue of Mr. McKelvey's sobriety. We likewise cannot conclude, therefore, that the trial court erred to *Page 118 
reversal in charging the jury on voluntary intoxication.
On the basis of the foregoing, we conclude that the trial court's judgment is due to be affirmed.
AFFIRMED.
CRAWLEY, P.J., and THOMPSON, PITTMAN, and BRYAN, JJ., concur.
[1] Mrs. McKelvey remarried after the traffic accident that is the subject of this lawsuit, and her current name is Deborah Jean McKelvey McGee. We refer to her in this opinion as "Mrs. McKelvey."
[2] Under questioning from Belew's counsel, Trooper Jones defined a yaw mark as it relates to the marks that the tires of a vehicle can leave on pavement:
 "Q. Would I be correct that if a car is traveling in this direction and is hit in the door, a side impact like that, that it will push it this way, and the tires will cause yaw marks?
"A. They will cause side skids.
"Q. Okay. Well, what is a yaw mark then?
 "A. If you were driving down the road at forty miles an hour, and you turn your wheels sharply to the left or the right, if you turn it to the right, the left front tire is going to continue to roll.
 "But it's also going to turn in to the direction that the steering wheel is turned, which is going to leave diagonal striations on the highway."
Trooper Jones also explained that a yaw mark results from "a tire that is still rolling that is in a side skid. It leaves diagonal striations on the asphalt."
[3] Belew argues that, in addition to Rule 702, the so-calledFrye standard for admissibility of scientific testimony also applies in this case. See generally Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). That standard provides that "a person who offers an opinion as a scientific expert must prove that he relied on scientific principles, methods, or procedures that have gained general acceptance in the field in which the expert is testifying." Slay v. Keller Indus., Inc., 823 So.2d 623, 626
(Ala. 2001).
As indicated, the Frye standard applies in the case of scientific testimony. The only test (if it can even be appropriately referred to as such) performed in the present case, placing automobiles over the skid and yaw marks left by Nelson's and the McKelveys' vehicles as an aid to determining the angles at which their vehicles were facing at impact, cannot be considered "scientific," because the test was comparative in nature and did not rely on scientific principles or theory. Furthermore, Nelson did not offer Trooper Jones as a scientific expert. As a result, the Frye standard did not apply to the results of Jones's "test," or to his opinions derived therefrom.See Courtaulds Fibers, Inc. v. Long, 779 So.2d 198, 202 (Ala. 2000) (testimony of expert derived from his or her knowledge, skill, and training, rather than from scientific experiment, is not subject to Frye standard of admissibility); Ex parteDolvin, 391 So.2d 677, 679 (Ala. 1980) (a physical comparison of conditions, as opposed to a scientific test or experiment, is not governed by the Frye standard of admissibility).
[4] At most, Trooper Jones admitted that the yaw marks were faint. However, he explained that the faintness of the yaw marks actually led him to conclude that they were, in fact, made by the McKelveys' car.
[5] To be sure, Belew's counsel challenged Trooper Jones's testimony at trial, pointing out that the yaw marks that Trooper Jones testified the McKelveys' car left in Nelson's lane of travel did not appear in any of the photographs admitted into evidence at the trial, and impeaching Trooper Jones's testimony with prior deposition testimony in which Trooper Jones appeared to indicate that he did not recall yaw marks in Nelson's lane of travel. In spite of these challenges to the credibility of Trooper Jones's testimony, the fact remains that Trooper Jones clearly testified at trial that the McKelveys' car left yaw marks in both lanes of travel. Any weakness in the evidentiary foundation of this testimony was a matter that went to its weight, rather than its admissibility. See Baker v. Edgar,472 So.2d 968, 970 (Ala. 1985) ("It is well settled that any challenge to the facts upon which an expert bases his opinion goes to the weight, rather than the admissibility, of the evidence." (citing Dyer v. Traeger, 357 So.2d 328, 330 (Ala. 1978))).
[6] The credibility of Mrs. McKelvey's testimony that Mr. McKelvey consumed only one and one-half of the two drinks he purchased for himself was a matter for the jury to consider in reaching its verdict.